**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **LARRY S. WHITE, II,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Nos. 2:21-00523** |
| | ) | |
| **SHELBY SEARLS,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court is Respondent's "Motion to Dismiss and for Summary Judgment" (Document No. 16), filed on April 15, 2022. By Standing Order, this matter was referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 4.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Respondent's "Motion to Dismiss and for Summary Judgment" (Document No. 16).

**PROCEDURAL HISTORY**

**A.    Criminal Action No. 08-F-10:**

On February 26, 2008, the Grand Jury of Jackson County, West Virginia, returned an Indictment against Petitioner charging him with one count of first degree murder in violation of W. Va. Code § 61-2-1 (Count One) and one count of conspiracy to commit first degree murder in violation of W. Va. Code § 61-10-31 (Count Two). (Document No. 9-1.) On April 18, 2008, Petitioner filed his "Notice of Intent to Rely on Defense of Defendant's Mental Condition."

(Document No. 17-2.) On December 20, 2008, following a five-day jury trial, Petitioner was convicted of both first degree murder and conspiracy to commit murder. (Document Nos. 9-2 and 17-17.) The jury made a recommendation of mercy. (Id.) On December 22, 2008, the Circuit Court sentenced Petitioner to life with mercy as to his conviction for first degree murder and not less than one year nor more than five years as to his conspiracy conviction. (Document No. 9-3.) The sentences were ordered to run consecutively to each other. (Id.)

On February 20, 2009, Petitioner, by counsel, filed a "Renewed Motion for New Trial Filed in Light of Post-Trial Disclosure to Defendant of Material That Should Have Been Disclosed to Defendant Prior to Trial Pursuant to *Brady v. Maryland*." (Document No. 9-4.) On July 23, 2009, Petitioner, by counsel, filed an "Amended Renewed Motion for New Trial Filed in Light of Post-Trial Disclosure to Defendant of Material That Should Have Been Disclosed to Defendant Prior to Trial Pursuant to *Brady v. Maryland*." (Document No. 9-5.) By Order filed on September 25, 2009, the Circuit Court denied the above Motions. (Document No. 9-6.)

On February 1, 2010, Petitioner, by counsel, Matthew L. Clark, filed a Petition for Appeal with the Supreme Court of Appeals of West Virginia ("SCAWV"). (Document No. 9-9.) In his appeal, Petitioner raised the following assignments of error:

1.    The trial court erred in failing to strike two prospective jurors for cause, Michelle Lemon and Cassia Scott, upon motion of Petitioner's counsel based upon various answers given by the prospective juror in voir dire.

2.    The trial court erred in not granting Petitioner's Motion for Judgment of Acquittal made at the close of the State's case in chief and renewed prior to entry of the jury's verdict as the evidence on which jury reached a verdict of guilty on the charges of murder in the first degree and conspiracy to commit a felony was insufficient as a matter of law for a reasonable jury to find that the Petitioner acted with premeditation, deliberation or a specific intent to kill the alleged victim.

3.      The trial court erred in admitting evidence that was fruit of an unlawful search of a cellular telephone owned by the Petitioner, Larry S. White, II, and erred in its holding that Petitioner did not maintain a legitimate, reasonable expectation of privacy in the electronic data of the cellular telephone. Said unlawful search produced evidence that [sic] provided a foundation to obtain further information including search warrants. Absent the initial unlawful search and the fruits thereof, little, if any, evidence was present supportive of the convictions for murder in the first degree or conspiracy to commit a felony-murder in the first degree.

4.      The trial court erred in admitting evidence in violation of Rule 801(d)(2)(E) of the West Virginia Rules of Evidence absent a proper foundation for admission of the statements of alleged co-conspirator.

5.      The trial court erred in failing to grant the Appellant's Amended Renewed Motion for New Trial Filed In Light Of Post-Trial Disclosure to Defendant of Material That Should Have Been Disclosed to Defendant Prior to Trial Pursuant to *Brady v. Maryland*.

6.      The trial court erred in denying Petitioner's Motion for New Trial as the cumulative error in Petitioner's trial and the insufficiency of the evidence supportive of verdicts of murder in the first degree and conspiracy to commit a felony mandated that a new trial should have been granted.

7.      The trial court erred in denying Petitioner's Motion for New Trial as cumulative error present in the pretrial, trial, and post-trial proceedings mandated that a new trial be granted.

(Id.) On February 1, 2010, the SCAWV granted the Petitioner's Petition for Appeal. (Document No. 9-10.) On June 14, 2010, Petitioner filed his Brief. (Document No. 9-11.) On August 11, 2010, the State filed its response brief. (Document No. 9-12.) On February 10, 2022, the SCAWV affirmed Petitioner's conviction and sentence. State v. White, 228 W. Va. 530, 722 S.E.2d 566 (2011) ) ("White I").

**B.      First State *Habeas* Petition (Case No. 11-C-29):**

On March 3, 2011, Petitioner, acting *pro se*, filed his Petition for Writ of *Habeas Corpus* in the Circuit Court of Jackson County. (Document No. 9-14.) Subsequently, the Circuit Court

appointed Shawn D. Bayliss as *habeas* counsel. (Id.) On January 20, 2014, Mr. Bayliss filed an

Amended *Habeas* Petition on behalf of Petitioner. (Document No. 16-20.) In the Amended

Petition, Petitioner asserted the following grounds for relief:

1. Petitioner was denied effective assistance of counsel at critical stages of the proceedings in the underlying criminal matter, in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article III, §§ 10 and 14 of the West Virginia Constitution. This denial deprived him of due process and gave rise to grave defects in pretrial strategy, plea negotiations, and the Petitioner's understanding of the nature and possible consequences of the proceedings against him.

2. The Petitioner believes that the pre-trial publicity in the Jackson County area was so great that it prevented him from being able to impanel a fair and impartial jury.

3. The Petitioner believes that his rights have been violated such that he has been unfairly punished for the trial court imposing against him consecutive sentences for the same transaction such that it is an unfair and unjust punishment for him to be required to serve additional time for what is essentially the same offense.

4. The Petitioner believes that his right to a fair trial were greatly prejudiced by the jury being privileged of his confession to the crimes herein. The alleged confession made by the Petitioner was coerced, and therefore cannot be a valid basis for his conviction. In order for this Court to consider whether or not a confession was coerced, the Court should conduct an examination based upon the totality of the circumstances State v. Farley, 192 W. Va. 247, 452 S.E.2d 50 (1994). Mr. White made a confession only after law enforcement officers had traveled to the State of Indiana and extradited him back to Jackson County, West Virginia. During the course of a six (6) hour interview, Mr. White ultimately confessed to killing the victim. Only after being thoroughly intimidated for such a protracted period of time, did he confess. He has no recollection of being properly advised of his Miranda rights. At no time would Mr. White had [sic] an expectation that he would be free to leave upon returning to West Virginia. The coercive atmosphere created by the closed quarters travel and six (6) hours of investigation without an attorney present was designed to extract an involuntary confession from the Petitioner, and therefore, the guilty pleas should be vacated.

5. Petitioner was denied a fair trial by the suppression of helpful evidence by

4

the prosecutor in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>State v. Youngblood</u>, 650 S.E.2d 119 (2007).

6.    The Petitioner believes that the underlying conviction should be vacated as his trial counsel failed to obtain, investigate, review and challenge the composition of the grand jury or its procedures.

7.    The Petitioner believes that the underlying conviction should be vacated as his trial counsel's refusal to subpoena certain witnesses and records.

8.    The Petitioner believes that the underlying conviction should be vacated and a new trial granted as the Court violated his Constitutional rights by making incorrect rulings on evidentiary issues. This is made manifest in the Court's denying his renewed Motion for New Trial without hearing any testimony and thus denying Petitioner the opportunity to sufficiently test the new evidence and present his case.

9.    The Petitioner believes that the underlying conviction should be vacated because of inappropriate statements by the trial judge.

10.    The Petitioner believes that the underlying conviction should be vacated because of inappropriate statements of the prosecutor.

11.    The Petitioner believes that the underlying conviction should be vacated as there was not sufficient evidence presented at the trial of his case to support the jury's findings of guilt.

12.    The Petitioner believes that the underlying conviction should be vacated as he received a severer sentence than he reasonably expected.

13.    The Petitioner believes that the underlying conviction should be vacated as the sentences imposed against him by this Court are excessive.

14.    The Petitioner believes that the underlying conviction should be vacated as his trial counsel was impaired by either alcohol or other controlled substances during the course of the trial.

15.    The Petitioner believes that the underlying criminal conviction should be vacated as the rate of compensation for court-appointed counsel is extremely low, and thus denied the Petitioner of his right to effective assistance of counsel.

(<u>Id.</u>) Petitioner also filed his *Losh* List. (Document No. 16-21.) On February 14, 2014, the State

5

filed its Answer to Petitioner's Petition. (Document No. 16-22.) The Circuit Court conducted an omnibus hearing on August 14, 2014. (Document No. 16-27.) The Circuit Court heard testimony from the following: (1) Matthew Clark, trial counsel; and (2) Petitioner. (Id.) By Order entered on October 28, 2014, the Circuit Court denied Petitioner's *habeas* Petition. (Document No. 9-15.)

On May 18, 2015, Petitioner, by counsel, Mr. Bayliss, filed his appeal concerning the Circuit Court's decision denying his *habeas* Petition. (Document No. 9-17.) On June 15, 2017, Petitioner filed his brief raising the following grounds:

1. Potential exculpatory evidence not disclosed to the defense prior to trial by the prosecutor.

2. Improper cell phone search should have been excluded from jury consideration.

3. Petitioner's right to effective assistance of counsel was violated due to trial counsel's deficient conduct in the preparation for trial and trial of this case, along with other errors.

   A. Trial counsel's failure to investigate case;

   B. Impaired counsel;

   C. Inadequately compensated counsel.

(Id.) On August 5, 2015, the State filed its Brief. (Document No. 9-18.) By Memorandum Decision filed on November 23, 2015, the SCAWV affirmed the decision of the Circuit Court and adopted and incorporated the Circuit Court's Order denying Petitioner's Petition. (Document No. 9-19.); White v. Plumley, 2015 WL 7628834 (W. Va. Nov. 23, 2015) ("White II").

**C.    Second State *Habeas* Petition (Case No. 16-C-66):**

On August 16, 2016, Petitioner, acting *pro se*, filed his Petition for Writ of *Habeas Corpus* in the Circuit Court of Jackson County. (Document No. 9-21.) Subsequently, the Circuit Court

appointed M. Tyler Mason as *habeas* counsel. (Document Nos. 9-20 and 16-29.) On November 7,

2018, Mr. Mason filed an Amended *Habeas* Petition on behalf of Petitioner. (Document No. 16-

29.) In the Amended Petition, Petitioner asserted the following grounds for relief:

1. Previous habeas counsel failed to claim Petitioner's trial counsel erred by not moving to strike juror Cassia Scott for cause "because of her prior knowledge of the case and exposure to actual documents and evidence during her employment in the [circuit] clerk's office" and failed to "inquire whether Ms. Scott took part in discussions about the case;"

2. Habeas counsel failed to claim trial counsel erred by waiving a presentence investigation;

3. Habeas counsel failed to claim the prosecutor's comment during closing argument regarding Petitioner's children was irrelevant evidence; and

4. Habeas counsel "raised the ground for relief that '[t]he Petitioner believes that the underlying conviction should be vacated because of inappropriate statements of the prosecutor'" at trial, but habeas "counsel failed to further elucidate the issue in the Petitioner or at the omnibus hearing."

(Document No. 16-29.) On February 1, 2019, the State filed a Motion for Summary Judgment.

(Document No. 16-28.) By Order entered on July 11, 2019, the Circuit Court granted in part the

State's Motion for Summary Judgment. (Document No. 16-29.) Specifically, the Circuit Court

granted summary judgment thereby dismissing Grounds One through Three of Petitioner's Petition

and directed additional briefing concerning Ground Four. (Id.) By Order entered on November 18,

2019, the Circuit Court granted summary judgment as to Ground Four and dismissed Petitioner's

Petition. (Document No. 16-32.)

Petitioner, by counsel, Mr. Mason, filed his appeal concerning the Circuit Court's decision

denying his *habeas* Petition. (Document No. 9-25.) On May 19, 2020, Petitioner filed his brief

raising the following grounds:

1. The Circuit Court erred in granting summary judgment on Grounds I, II, III of the Petition for Habeas Corpus.

7

2.      The Circuit Court erred in granting summary judgment on Ground IV of the Petition for Habeas Corpus, where it was clear that the prosecutor made a prejudicial misstatement of law during closing argument.

(Id.) On May 18, 2020, the State filed its Brief. (Document No. 9-26.) By Memorandum Decision filed on May 20, 2021, the SCAWV affirmed the decision of the Circuit Court. White v. Searls, 2021 WL 2023585 (W. Va. May 20, 2021) ("White III").

**D.      Section 2254 Petition:**

On September 17, 2021, Petitioner, acting *pro se*, filed his Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody (Document No. 2). In his Petition, Petitioner alleges the following grounds for *habeas* relief:

1.      Violation of Due Process Clause of the Fourteenth Amendment to the United States Constitution. The trial court failed to disqualify two prospective jurors, Michelle Lemon and Cassia Scott.

Ms. Lemon admitted to the trial judge that she had a personal relationship with Detective Tony Boggs who was a detective in the Petitioner's case. She referred to Detective Boggs as "Tony" and testified that she visited his mother frequently over a ten year period.

Ms. Scott revealed that she was a Jackson County Courthouse employee and had knowledge of the Petitioner's case in her employment capacity. She informed the court that her impression of the case indicated a "sneak attack" which is how the state presented the case. She further informed the court she was concerned about keeping her emotions in check. She also had a negative response to the fact that the case would show an extramarital relationship was engaged in by the Petitioner and answered ambiguously when informed psychological testimony would be part of Petitioner's defense.

The above jurors should never have been on the jury and the trial court abandoned its role as an arbiter of fairness by allowing the two women to be seated, especially so Ms. Scott as her bias toward the Petitioner is clearly evident.

2.      Violation of the Due Process Clause of the Fourteenth Amendment to the

8

United States Constitution.

After the alleged murder, the investigating officers conducted a warrantless search of a cellular telephone (which turned out to be owned by the Petitioner) obtained from the automobile owned by the victim. This search led the police to the Petitioner and in turn led them to another cell phone and evidence the Petitioner's telephone calls to the co-defendant in this case, who was accused of acting in concert with the Petitioner to kill the victim.

The Petitioner filed a motion to suppress all derivative evidence (including an inculpatory statement given by the Petitioner) obtained from the search of the originally found cell phone. The Petitioner opined that a separate search warrant should have issued before the cell phone was searched. The trial court denied the motion ruling that the cell phone was no different than a "container" found discovered during a lawful search.

Due to the denial of the suppression motion, the trial court prejudiced the Petitioner greatly by allowing illegally seized evidence (all subject to the fruit of the poisonous tree principle) to be admitted at trial and without illegally seized evidence (and its derivates) the Petitioner could not have been convicted.

3.    Violation of Due Process Clause of Fourteenth Amendment to the United States Constitution.

At trial, the trial court admitted statements made by the co-defendant, Roseann Osbourne, (to police and Angela Barnes) which were in complete contradiction of the United States Supreme Court case law. These statements also did not meet the hearsay exceptions, as they do not establish a proper foundation of a common plan, conspiracy, or joint enterprise. The basis provided by the trial court for allowing the statements failed to declare, with any specificity what the conspiracy or scheme was. Without the faultily admitted hearsay, the Petitioner's conviction would have been impossible.

4.    Violation of Due Process Clause of Fourteenth Amendment to the United States Constitution.

Prior to the Petitioner's co-defendant being placed on trial (but after the Petitioner had been sentenced in December 2008) the state revealed to her pieces of evidence that were not revealed to the Petitioner before his trial.

The evidence disclosed were certain court records from North Carolina that showed the alleged victim in the case to have been the subject of domestic

violence petitions in that state. The records would have bolstered the Petitioner's contention that he feared for the safety and well-being of the co-defendant and diminished his capacity to be culpable as to the charge of first-degree murder. The State further disclosed a video taken from surveillance camera close to where the alleged crime took place that contradicted the timeline asserted by the State. Had the Petitioner had the records from North Carolina and/or the video there is no doubt that the jury would have come to a different conclusion in his case.

5.  Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The evidence was insufficient to convict the Petitioner of first-degree murder and conspiracy as no direct evidence was ever submitted (none existed) at trial show some plot between the Petitioner and the co-defendant to conspire to kill the alleged victim. The jury, in incorrectly finding the perquisites of premeditation and deliberation to commit first-degree murder and conspiracy, considered inference upon inference rather than an inference based upon the actual scant circumstantial evidence submitted at trial. At most, the jury should have arrived at a verdict of second-degree murder based on the evidence submitted and the trial court should have granted the Petitioner a new trial after he filed a motion for such.

6.  Violation of Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Many pretrial, trial, and post-trial constitutional errors were committed by the trial court in its rulings. It allowed the jury to construct admissions of elements of circumstantial evidence that were obtained by the state unconstitutionally. It allowed illegally cellphone evidence to be presented, an illegally obtained confession to be used, and hearsay statements to be considered by the jury. Although the errors by themselves may not rise to constitutional deficiencies together, when combined they do reach constitutional violations and the trial court should have granted the Petitioner a new trial after he filed a motion for such.

7.  Ineffective Assistance of Trial Counsel in Violation of the Sixth Amendment to the United States Constitution.

At trial, the Petitioner's trial attorneys failed to adduce evidence (that was known, or should have been known to them) that would have shown the alleged victim to be a man of violence and, in fact, of an evil disposition. The Petitioner's attorneys also did not adequately investigate the case as they did not obtain certain court records from North Carolina that showed

the alleged victim in the case to have been the subject of domestic violence petitions in that state, they did not call Victim's Advocate Melissa Wilkinson to testify regarding a domestic violence protective order against the alleged victim; did not call witnesses to testify about charges and a domestic violence order against the alleged victim in North Carolina and further they did not reveal in any manner that the alleged victim had a shoplifting charge, a drug charge, and immigration issues. They did not hire any investigator as was promised to the defendant.

The Petitioner's theory of defense was diminished capacity to commit first-degree murder as he feared for the life of the co-defendant, Roseann Osbourne due to violence at the hands of the alleged victim, her husband. Had the Petitioner's attorney did their job by adequate investigation and revealed the alleged victim's true nature to the jury a second-degree murder conviction, at worst, would have been arrived at.

8.      Violation of Due Process Clause of Fourteenth Amendment to the United States Constitution.

The Petitioner gave a statement that was the result of a six hour interrogation in which the Petitioner felt very intimidated and was not free to leave. The Petitioner ultimately gave a statement implicating himself. This confession should not have been admitted by the trial court and it erred in not granting the Petitioner's motion to suppress the statement. Without the statement, the Petitioner is at worst, convicted of second degree murder, not first degree.

9.      Violation of Due Process Clause of Fourteenth Amendment to the United States Constitution (Brady Violation).

Prior to the Petitioner's co-defendant being placed on trial (but after the Petitioner had been sentenced in December 2008), the State revealed to her pieces of evidence that were not revealed to the Petitioner before his trial. The evidence disclosed were certain court records from North Carolina that showed the alleged victim in the case to have been the subject of domestic violence petitions in that state. The records would have bolstered the Petitioner's contention that he feared for the safety and wellbeing of the co-defendant and diminished his capacity to be culpable as to the charge of first-degree murder.

The above records were willfully and deliberately withheld from the Petitioner because the Petitioner's theory of defense was diminished capacity to commit first-degree murder as he feared for the life of the co-defendant, Roseann Osbourne, due to violence at the hands of the alleged victim, her husband. Had the Petitioner's attorney did their job by adequate

11

investigation and revealed the alleged victim's true nature to the jury a second-degree murder conviction, at worst, would have been arrived at.

10.   Ineffective Assistance of Trial Counsel in Violation of the Sixth Amendment to the United States Constitution.

The Petitioner contends that his trial counsel failed to obtain, investigate, review, and challenge the composition of the grand jury or its procedures. Had this been done the result of the trial would have been different.

11.   Petitioner received ineffective assistance of counsel in the prior habeas corpus proceedings, White v. Plumley, Jackson County Case No. 11-C-29, and its appeal, No. 14-1272, 2015 WL 7628834 (W.Va. Nov. 23, 2015).

Sean Bayless, the Petitioner's prior counsel in White v. Plumley, Jackson County Case No. 11-C-29, and its Appeal, No. 14-1272, 2015 WL 7628834 (W.Va. Nov. 23, 2015) failed to raise numerous assignments of error relating to the ineffective assistance of counsel the Petitioner received from his trial counsel Matthew Clark and Jeremy Vickers.

A.   Defense counsel, Matthew Clark and Jeremy Vickers, failed to conduct proper voir dire on Juror Cassia Scott, and then failed to raise proper grounds on the record to strike Ms. Scott for cause.

***

B.   Defense counsel, Matt Clark, waived the Petitioner's presentence investigation. Pg. 63. The Petitioner has no significant criminal history. He has never had any substance abuse issues. The Petitioner has a good employment history. The Petitioner did not testify at trial. Accordingly, the Petitioner never gave a personal recounting of is involvement in the crime until the actual sentencing hearing, nor did he get an opportunity to fully explain his motives for participating in these acts to the court.

***

C.   Sean Bayless, the Petitioner's prior habeas counsel, raised the ground for relief that "[t]he Petitioner believes that the underlying conviction should be vacated because of inappropriate statements of the prosecutor." However, despite raising this claim in the Petition, counsel failed to further elucidate the issue in the Petition or at the omnibus hearing. This failure by the Petitioner's prior habeas counsel was deficient under an objective standard of reasonableness; and there is a reasonable probability that, but for counsel's unprofessional errors, the

12

result of the prior habeas corpus proceedings would have been different.

\*\*\*

(Document No. 2.) By Order entered on October 22, 2021, the undersigned noted that a preliminary review of Petitioner's Petition indicated that Petitioner's Petition may be time-barred. (Document No. 7.) (Id.) Thus, the undersigned directed the Respondent to file a limited Response addressing the timeliness of Petitioner's Petition. (Id.) On December 15, 2021, Respondent filed his "Limited Response" stating that "Petitioner's § 2254 Petition appears to be timely under 28 U.S.C. § 2244(d)." (Document No. 9.)

By Order entered on December 30, 2021, the undersigned directed Respondent to file a Response addressing the merits of Petitioner's Petition. (Document No. 10.) On April 15, 2022, Respondent filed his "Motion to Dismiss and for Summary Judgment" and Memorandum in Support. (Document Nos. 16 and 17.) As Exhibits, Respondent attaches the following: (1) A copy of Petitioner's Notice of Intent to Rely Upon Defense Based Upon Defendant's Medical Condition as filed in Case No. 08-F-10 (Document No. 16-1.); (2) A copy of Petitioner's "Motion to Suppress Written or Oral Statements as filed in Case No. 08-F-10 (Document No. 16-2.); (3) A copy of Petitioner's Motion to Suppress Cellular Phone Records and Cellular Tower Information for Sprint Nextel Telephone Numbers 434-688-1505 and 434-688-1106 as filed in Case No. 08-F-10 (Document No. 16-3.); (4) A copy of Petitioner's Motion to Suppress Certain Items Seized from the Truck Owned by Larry S. White as Said Seizure Exceeded the Scope of the Warrant Issued on September 19, 2007 as filed in Case No. 08-F-10 (Document No. 16-4.); (5) A copy of Petitioner's Motion in Limine – Roseann Osborne Statements as filed in Case No. 08-F-10 (Document No. 16-5.); (6) A copy of Petitioner's Motion in Limine – Recorded Jail Statements as filed in Case No.

13

08-F-10 (Document No. 16-6.); (7) A copy of the Search Warrants and accompanying attachments and Affidavits obtained on September 19 and 27, 2007, in Case No. 08-F-10 (Document No. 16-7.); (8) A copy of the Circuit Court's Order dated September 18, 2008, regarding Petitioner's Motion to Suppress and directing the parties to submit Memorandum of Law as filed in Case No. 08-F-10 (Document No. 16-8.); (9) A copy of the Petitioner's Memorandum in Support of his previously filed Motions to Suppress as filed in Case No. 08-F-10 (Document No. 16-9.); (10) A copy of the State's Response to Petitioner's Motion to Suppress as filed in Case No. 08-F-10 (Document No. 16-10.); (11) A copy of the Circuit Court's Order denying Petitioner's Motion to Suppress Evidence as filed in Case No. 08-F-10 (Document No. 16-11.); (12) A copy of the trial transcripts for December 16 - 20, 2008, in Case No. 08-F-10 (Document Nos. 16-12, 16-13, 16-14, 16-15, 16-16.); (13) A copy of the Jury Verdict as returned in Case No. 08-F-10 (Document No. 16-17.); (14) A copy of the trial docket of the testifying witnesses in Case No. 08-F-10 (Document No. 16-18.); (15) A copy of the Circuit Court's List of Evidence Admitted and/or Introduced at Trial in Case No. 08-F-10 (Document No. 16-19.); (16) A copy of Petitioner's Amended State Habeas Petition as filed in Case No. 11-C-29 (Document No. 16-20.); (17) A copy of Petitioner's Habeas Corpus Notification Form and *Losh* List as filed in Case No. 11-C-29 (Document No. 16-21.); (18) A copy of the State's Answer to Petition for Writ of Habeas Corpus & Motion for Summary Judgment as filed in Case No. 11-C-29 (Document No. 16-22.); (19) A copy of the Circuit Court's Order dated March 12, 2014, denying the State's Motion for Summary Judgment and Setting an Omnibus Evidentiary Hearing as filed in Case No. 11-C-29 (Document No. 16-23.); (20) A copy of a Typewritten Statement from Melissa Wilkinson as filed in Case No. 11-C-29 (Document NO. 16-24); (21) A copy of a Typewritten Statement from Shannon Baldwin

14

as filed in Case No. 11-C-29 (Document No. 16-25); (22) A copy of the Domestic Violence Records from North Carolina regarding Mohamed Mahrous and Roseann Osborne as presented in Case No. 11-C-29 (Document No. 16-26.); (23) A copy of the transcripts from the omnibus hearing conduct on August 14, 2014, in Case No. 11-C-29 (Document No. 16-27.); (24) A copy of the State's Answer and Motion for Summary Judgment as filed in Case No. 16-C-66 (Document No. 16-28.); (25) A copy of the Circuit Court's "Order Entering Partial Summary Dismissal and Directing Additional Briefing and Expansion of the Record" as filed on July 11, 2019, in Case No. 16-C-66 (Document No. 16-29.); (26) A copy of Petitioner's Memorandum of Law concerning Ground IV as filed in Case No. 16-C-66 (Document No. 16-30.); (27) A copy of the State's Response regrading Petitioner's Ground IV as filed in Case No. 16-C-66 (Document No. 16-31.); and (28) A copy of the Circuit Court's "Order Granting Summary Judgment on Ground IV and Dismissing" as filed in Case No. 16-C-66 (Document No. 16-32.).

On April 15, 2022, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a response to Respondent's Answer. (Document No. 19.) On July 1, 2022, following the granting of two extensions of time, Petitioner filed his Response in Opposition. (Document No. 24.)

## FACTUAL BACKGROUND

The above action arises from the 2007 murder of Mohammed Mahrous in Jackson County, West Virginia. Following a jury trial, Petitioner was convicted of First Degree Murder and Conspiracy to Commit Murder. Petitioner appealed his conviction and sentence to the SCAWV. The SCAWV summarized the facts as follows:

According to the evidence presented at trial, at the time relevant to the instant matter, the defendant, Mr. White, and Roseann Osborne, the victim's wife

15

(hereinafter referred to as "Ms. Osborne"), had been romantically involved for some time, had lived together for nearly a year, and had a young child together, notwithstanding the fact that Ms. Osborne was, throughout this time, married to Mohammed Mahrous (hereinafter referred to as "Mr. Mahrous"). There was also evidence that Mr. White and Ms. Osborne had, at various times, discussed their desire to murder Mr. Mahrous in the presence of one of their friends, Angelina Barney.

Sometime after 9:15 p.m. on September 17, 2007, Ms. Osborne and her husband, Mr. Mahrous, met at Riverfront Park in Ravenswood, West Virginia. Ms. Osborne drove to the park in a yellow Ford truck that was owned by her husband, and her husband drove to the park in a vehicle she owned. While Ms. Osborne and Mr. Mahrous were at the park, Mr. White approached them and inflicted three forceful blows to Mr. Mahrous's head with a hammer, causing his death. The evidence established that the hammer was in a plastic bag during the attack. The plastic bag, stained with traces of Mr. Mahrous's blood, was later discovered on the river bank, and a subsequent search of the river produced the hammer. Stuck to the hammer was a piece of the plastic bag.

Following the attack, Mr. White departed from the park, while, at approximately 10:22 p.m., Ms. Osborne called the Jackson County 911 Center and reported that her husband had been attacked by an unknown assailant who first asked him for a cigarette and then began to strike him in the head. Ms. Osborne gave a description of the assailant that did not match Mr. White. Police and emergency personnel responded and Mr. Mahrous was pronounced dead at the scene.

The yellow Ford truck and Ms. Osborne's vehicle were transported to the city maintenance garage in Ravenswood, West Virginia, and, relevant to this case, a search warrant was obtained to search the truck. Among other things, a Motorola cellular telephone was seized during the search. The telephone led investigators to the defendant, Mr. White, who was then in the State of Indiana. Officers traveled to Indiana to take a statement from Mr. White. During the course of a six-hour interview, Mr. White ultimately confessed to killing Mr. Mahrous by striking him in the head with a hammer. Following the investigation, a grand jury indicted Mr. White and Ms. Osborne with murder in the first degree and conspiracy to commit murder in the first degree. Mr. White and Ms. Osborne were tried separately.

At trial, Mr. White did not dispute that he had killed Mr. Mahrous. Rather, he presented a diminished capacity defense, arguing that he lacked the ability to premeditate and deliberate Mr. Mahrous's murder. The jury found him guilty of the murder in the first degree with a recommendation of mercy, and likewise found him guilty of conspiracy to commit a felony. Mr. White filed a motion for a new trial, and the motion was denied. The trial court then sentenced him to life with mercy for the charge of first degree murder, and a term of not less than one year nor more than five years for the conspiracy charge. The two sentences are to be served consecutively. Mr. White then filed an "Amended Renewed Motion for New Trial." The trial court denied the motion, and this appeal followed.

White I, 228 W.Va. at 535-36, 772 S.E.2d at 571-72.

### THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a Section 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To trigger the above AEDPA deference, a State Court's decisions must be "adjudicated on the merits." Gordon v. Braxton, 780 F.3d 196, 202 (4th Cir. 2015)(If the State court's decision does not qualify as an "adjudication on the merits," AEDPA deference is not triggered and the Court must review the issue *de novo*.). A claim is "adjudicated on the merits" if the claim "is exhausted in state court and not procedurally defaulted." Gray v. Zook, 806 F.3d 783, 798 (4th Cir. 2015)(citation omitted); also see Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)(explaining that a claim has been adjudicated upon the merits where the claim was "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree"); Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), *abrogation on other grounds recognized*, United States v. Barnett, 644 F.3d 192 (4th Cir. 2011)(Exhaustion requires that a claim be "fairly presented," such that the claim was presented face-up and squarely, providing an opportunity for

17

review by the highest state court.) It is a case-specific inquiry as to whether a claim has been "adjudicated on the merits," but a "claim is not 'adjudicated on the merits' when the state court makes its decision 'on a materially incomplete record.'" Braxton, 780 F.3d at 202 (citing Winston v. Kelly (Winston I), 592 F.3d 535, 544 (4th Cir. 2010)(The record may be materially incomplete if a state court "unreasonably refuses to permit further development of the facts.") The Fourth Circuit has explained that where a state court "unreasonably refuses to permit further develop of the facts," it passes up the opportunity that exhaustion ensures. Winston v. Pearson (Winston II), 683 F.3d 489, 496 (4th Cir. 2012)(exhaustion requires that a state court have an opportunity to apply the law and consider all relevant evidence to petitioner's claim). Additionally, the "adjudication on the merits" requirement does not exclude "claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999); also see Winton II, 683 F.3d at 502(discussing Harrington v. Richter, 562 U.S 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)(noting that although a state court's summary denial may be presumed an "adjudication on the merits," a federal court may still find that the state court did not adjudicate a claim on the merits if the thoroughness of the state court's development of the record is challenged and there was a materially incomplete record before the state court.) When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.), cert. denied, 524 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). The Court, however, must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158; also see Harrington, 562 U.S at 98 – 99, 131 S.Ct. at 770("Where

18

a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.").

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at 1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id.(A "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."); also see Woods v. Donald, 575 U.S. 312, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015)(*per curiam*)(For a state court's decision to be an unreasonable application of clearly established federal law, the ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice.") Thus, a litigant must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S at 103, 131 S.Ct. at 770. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the

fact.'" 28 U.S.C. § 2254(d)(2). In reviewing a State Court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by the State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003); also see 28 U.S.C. § 2254(e).[1]

**Motion to Dismiss:**

In Section 2254 proceedings, the familiar standards of Rule 12(b)(6) of the Federal Rules of Civil Procedure apply to motions to dismiss. See Walker v. True, 399 F.3d 315, 319, n. 1. (4th Cir. 2005); also see Rules Governing Section 2254 Cases in the United States District Courts, Rule 12 (The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with the *habeas* rules, may be applied to Section 2254 proceedings). A motion to dismiss a Section 2254 petition under Rule 12(b)(6) "tests the legal sufficiency of the petition, requiring the federal habeas court to 'assume all facts pleaded by the § 2254 petitioner to be true." Walker v. Kelly, , 139 (4th Cir. 2009)(citing Wolfe v. Johnson, 565 F.3d 140, 169 (4th Cir. 2009). The court, however, is "not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" Massey

---

[1] Title 28, U.S.C. Section 2254(e) provides:

    (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

    (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

        (A) the claim relies on –

            (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

            (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

        (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014)(quoting Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006). When assessing whether the Section 2254 petition states a claim for relief, the court must consider "the face of the petition any attached exhibits." Wolfe, 565 F.3d at 169 (internal quotations omitted). The court may also consider such exhibits and matters of public record, such as documents from prior state court proceedings, in conjunction with a Rule 12(b)(6) motion without having to convert the motion to one for summary judgment. Walker, 589 F.3d at 139. Finally, the undersigned notes that the same standard of review applies to motions to dismiss under Rule 12(b)(6) and motions for judgment on the pleadings under Rule 12(c), and both motions may be filed in Section 2254 actions. Walker v. Kelley, 589 F.3d 127, 138-39 (4th Cir. 2009).

**Motion for Summary Judgment:**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party

on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support non-moving party's claims, summary judgment is appropriate.

**ANALYSIS**

1.    <u>**Grounds Two, Three, Six, and Eleven are not cognizable**</u>:

In Respondent's Motion, Respondent argues that Grounds Two, Three, Six, and Eleven should be dismissed because they fail to present a cognizable ground for review in federal *habeas corpus*. (Document No. 17, pp. 16 – 25.) Petitioner, however, argues that the above Grounds "do present grounds for federal habeas corpus relief." (Document No. 24, p. 1.)

   *A.  Ground Two - Violation of Due Process Rights Based Upon the Circuit Court's Admission of Evidence Allegedly Obtained in Violation of the Fourteenth Amendment.*

In his Petition, Petitioner argues a "violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Document No. 2, pp. 7 – 8.) In support, Petitioner states as follows:

> After the alleged murder, the investigating officers conducted a warrantless search of a cellular telephone (which turned out to be owned by the Petitioner) obtained from the automobile owned by the victim. This search led the police to the Petitioner and in turn led them to another cell phone and evidence the Petitioner's telephone calls to the co-defendant in this case, who was accused of acting in concert with the Petitioner to kill the victim.

> The Petitioner filed a motion to suppress all derivative evidence (including an inculpatory statement given by the Petitioner) obtained from the search of the originally found cell phone. The Petitioner opined that a separate search warrant should have issued before the cell phone was searched. The trial court denied the motion ruling that the cell phone was no different than a "container" found discovered during a lawful search.

> Due to the denial of the suppression motion, the trial court prejudiced the Petitioner greatly by allowing illegally seized evidence (all subject to the fruit of the poisonous tree principle) to be admitted at trial and without illegally seized

22

evidence (and its derivates) the Petitioner could not have been convicted.

(Id.)

In his Motion, Respondent argues that the Ground should be dismissed because it fails to present a cognizable ground for review in federal *habeas corpus*. (Document Nos. 16 and 17.) Respondent first notes that "Petitioner never advanced this claim as a 'Due Process violation' during any of the proceedings held in State court." (Document No. 17, p. 16.) Respondent explains that Petitioner raised the above claim "as one involving the Fourth Amendment to the United States Constitution, the United States Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), and the WVSCA's decision in State v. Youngblood, 650 S.E.2d 119 (2007)." (Id., p. 18.) Respondent argues that "Petitioner was afforded the opportunity to raise his Fourth Amendment claims in the State courts, and therefore, Petitioner is not entitled to Federal *habeas* review of these claims. (Document No. 17, pp. 16 – 19.) Citing Stone v. Powell, Respondent argues that Petitioner's Fourth Amendment claims are not cognizable because they were fully considered on the merits by the State court. (Id.) Respondent states that "Petitioner filed three pretrial motions asking the trial court to suppress evidence obtained during the execution of two search warrants obtained in his underlying criminal proceedings." (Id., p. 18.) Specifically, Respondent explains that follows:

> On August 25, 2008, he filed a motion to suppress evidence seized from the search of his truck conducted pursuant to a warrant issued on September 19, 2007, (Ex. 4), as well as, inter alia, a motion to suppress cellular phone records and cellular tower information, (Ex. 3). The circuit court convened a hearing with respect to these motions on September 5, 2008, at which time the parties were directed to provide memorandums in support of their respective positions, (Ex. 8). Both the Petitioner, (Ex. 9), and the State (Ex. 10) provided competing memorandums of law in support of their positions, and the circuit court issued an order denying Petitioner's motions, (Ex. 11). Following his trial, Petitioner sought redress through his direct appeal to the WVSCA, (White I), and again during his subsequent state habeas proceedings,

23

(White II).

(Id.) To the extent this Court finds the above issue is cognizable, Respondent further argues that

the above issue is procedurally barred. (Id., p. 16.) Respondent notes that exhaustion requires that

a petitioner fairly and fully present he claim, including the federal constitutional theory, in state

court. (Id.) Citing Duncan v. Henry, 513 U.S. 364 (1995), Respondent argues that "[i]f a habeas

petitioner wishes to claim that an evidentiary ruling at state court trial denied him the due process

of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in

state court." (Id., p. 16.)

In Response, Petitioner argues that "Ground Two is cognizable on federal habeas."

(Document No. 24, p. 3.) Petitioner first contends that the State *habeas* court and the SCAWV

improperly determined "that once a cell phone had been seized from an arrestee the contents of it

could be search without a search warrant being obtained." (Id., pp. 3 – 4.) Petitioner asserts that in

White I, 227 W. Va. 231 (2011), the SCAWV held that "when searching a vehicle pursuant to a

valid search warrant, no additional search warrant is required to examine the contents of items that

are properly seized in the execution of the warrant, including, but not limited to, cellular

telephones." (Id.) Citing Riley v. California, 573 U.S. 373, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430

(2014), Petitioner argues that he had a reasonable expectation of privacy in his cell phone and a

search warrant was required before searching his cell phone. (Id.) Petitioner argues that the Circuit

Court and the SCAWV incorrectly relied upon White I, instead of Riley, when denying his request

for *habeas* relief concerning the above issue. (Id., p. 4.) Based upon the foregoing, Petitioner

asserts that "the dictates of Stone v. Powell, 428 U.S. 465 (1976) do not hold sway as the claim

was not fairly adjudicated by the West Virginia Judicial Courts." (Id.) Petitioner explains that his

24

"opportunity for a fair litigation of his Fourth Amendment claim was impaired by the unreasonable application of Riley to his case when the case law used to decide the State court decisions came about in 2011, some three years before Riley was decided in 2014." (Id.)

First, the undersigned will consider whether the above claim is procedurally defaulted. To the extent Petitioner alleges the search of his cellphone was in violation of his Due Process Rights under the Fourteenth Amendment, Respondent argues that such a claim is procedurally defaulted. As stated above, AEDPA provides that state prisoners must exhaust available state remedies prior to filing a § 2254 petition in federal court. 28 U.S.C. § 2254(b)(1)(A); see also, McDaniel, 631 F.Supp. at 1545. Section 2254(b)(1)'s exhaustion requirement can be satisfied in either one of two ways: (1) the Petitioner can fairly present all claims in state court, or (2) the Petitioner's claims will be deemed exhausted if no state remedies are currently available. See Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996). Fair presentation requires the Petitioner to (1) present the same claims (2) to all appropriate state courts. See Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), *abrogated on other grounds*, United States v. Barnette, 644 F.3d 192 (4th Cir. 2011). Presentation of the same claim "contemplates that 'both the operative facts and the 'controlling legal principles' 'must be presented to the state court." Id. (quoting Verdin v. O'Leary, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting Picard v. Connor, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). Although it is unnecessary to cite "book and verse on the federal constitution," "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." See Picard, 404 U.S. at 278, 92 S.Ct. at 514; Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)(internal citations omitted); Baker v. Corcoran, 220 F.3d 276, 289 (4th Cir. 2000).

The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." <u>Matthews</u>, <u>supra</u>, 105 at 911. "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66, 115 S.Ct. 887, 886, 130 L.Ed.2d 865 (1995); <u>see also</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 32, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004)(stating that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal'"). Petitioner must also provide the state court with the facts supporting the claimed constitutional violation and "explain how those alleged events establish a violation of his constitutional rights." <u>Mallory v. Smith</u>, 27 F.3d 991, 994 (4th Cir. 1994). The requirement of presentation of the same claim to all appropriate state courts is designed to give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). This requirement is satisfied by presentation to the state's highest court on either direct or collateral review. <u>Id.</u> at 844, 119 S.Ct. at 1732. In West Virginia, prisoners may exhaust their available State court remedies by the following: (1) stating cognizable federal constitutional claims in a direct appeal to the SCAWV; (2) stating cognizable federal constitutional claims in a petition for a writ of *habeas corpus* in a State circuit court pursuant to

West Virginia Code § 53-4A-1, followed by filing a petition for appeal from an adverse ruling to the SCAWV; or (3) filing a petition for writ of *habeas* corpus under the SCAWV's original jurisdiction and receiving a dismissal with prejudice.[2] Moore v. Kirby, 879 F.Supp. 592, 593 (S.D.W.Va. 1995); McDaniel v. Holland, 631 F.Supp. 1544, 1545-46 (S.D.W.Va. 1986).

Generally, a federal district court may not review a Section 2254 petition unless there has been "total exhaustion" of the presented issues. Rose v. Lundy, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); also see Preiser v. Rodriguez, 411 U.S. 475, 477, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)(When a petitioner fails to exhaust his state court remedies, a federal *habeas* petition should be dismissed.) When a petitioner presents a mixed petition under § 2254, that is a petition containing claims that are both exhausted and unexhausted, the District Court may (1) dismiss the petition in its entirety; (2) order a stay and abeyance while the petitioner exhausts his claims in State Court; or (3) allow the petitioner to remove the unexhausted claim claims and proceed with the exhausted claims. Rhines v. Weber, 544 U.S. 269, 275-77, 125 S.Ct. 1528, 161 L.E.2d 440 (2005). "[N]otwithstanding the failure of an applicant to exhaust the remedies available in the courts of the state," a district court may deny the unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2); also see White v. Keller, 2013 WL 791008, * 5 (M.D.N.C. March 4, 2013). To be excused from the exhaustion requirement, Petitioner must establish that "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). The foregoing statutory exceptions apply "only if there is no opportunity to obtain redress in state court or if the corrective process is

---

[2] An original jurisdiction petition that is denied without an indication that the denial is with prejudice following a determination on the merits will not exhaust the petitioner's state court remedies. *See Moore*, 879 F.Supp. at 593; *McDaniel*, 631 F.Supp. at 1546; *see also, Meadows v. Legursky*, 904 F.2d 903, 908-09 (4th Cir. 1990)(*abrogated on other grounds, Trest v. Cain*, 522 U.S. 87, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997)).

27

so clearly deficient as to render futile any effort to obtain relief." <u>Duckworth v. Serrano</u>, 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). "State remedies may be rendered ineffective by inordinate delay or inaction in state proceedings." <u>Ward v. Freeman</u>, 46 F.3d 1129 (4th Cir. 1995)(unpublished table decision); <u>Farmer v. Circuit Court of Md. for Balt. City.</u>, 31 F.3d 219, 223 (4th Cir. 1994)("There is . . . authority for treating sufficiently diligent, though unavailing, efforts to exhaust as, effectively, exhaustion, and for excusing efforts sufficiently shown to be futile in the face of state dilatoriness or recalcitrance.").

The record clearly reveals that Petitioner never presented to the SCAWV his claim that the search of his cellphone violated his due process rights under the Fourteenth Amendment. Petitioner does not dispute the foregoing. Thus, the undersigned finds that the above Ground is unexhausted and there is no allegation or indication that Petitioner should be excused from the exhaustion requirement. Nevertheless, a claim that has not been presented to the state's highest court "may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." <u>Baker v. Corcoran</u>, 220 F.3d 276, 288 (4th Cir. 2000)(citing <u>Gray v. Netherland</u>, 518 U.S. 152, 161, 116 S.Ct. 2074, 2081, 135 l.Ed.2d 457 (1996)); <u>also see</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991)("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.") Although such claims are technically exhausted, the procedural default doctrine applies to those claims in a subsequent Section 2254 proceeding. <u>See</u> <u>Clagett v. Angelone</u>, 209 F.3d 370, 378 (4th Cir. 2000)("If claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted

28

in the state courts.")

The procedural default doctrine prevents a federal court from hearing a claim that has been, or would be, disposed of on "adequate and independent state-law grounds, unless the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." See Bostick v. Stevenson, 589 F.3d 160, 164 (4ᵗʰ Cir. 2009); Weeks v. Angelone, 176 F.3d 249, 270 (4ᵗʰ Cir. 1999)("A state rule is adequate if it is 'firmly establish,' and regularly and consistently applied by state court, and is independent if it does not 'depend[] on a federal constitutional ruling.")(internal citations omitted). West Virginia Code § 53-4A-1(c) creates a rebuttable presumption that a state *habeas* petitioner knowingly and intelligently waives any claim that could have been, but was not, presented during the state *habeas* proceedings. Thus, the foregoing procedural bar "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal *habeas corpus* review of the default claim, unless the petitioner can demonstrate cause and prejudice of the default.'" See Hayes v. Plumley, 2016 WL 5662037, * 4 (S.D.W.Va. Sep. 30, 2016)(citing Coleman, 501 U.S. at 732, 111 S.Ct. at 2555); also see Green v. Ballard, 2015 WL 1612198, * 5 (S.D.W.Va. April 10, 2015)(recognizing that W.Va. Code § 53-4A-1(c) is "an adequate and independent state ground" for purposes of procedural default). The Fourth Circuit has recognized that "procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Wolfe v. Johnson, 565 F.3d 140, 158, n. 27 (4ᵗʰ Cir. 2009)(internal citations omitted). Generally, ineffective assistance of *habeas*

counsel is not considered an external factor that would excuse the failure to exhaust a claim for *habeas corpus* relief. See <u>Maples v. Thomas</u>, 565 U.S. 266, 280, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012)(citation omitted)("Negligence on the part of a prisoner's postconviction attorney does not qualify as cause.'"). In <u>Martinez v. Ryan</u>, however, the Supreme Court recognized a limited exception. <u>Martinez v. Ryan</u>, 556 U.S. 1, 17, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012). The Supreme Court held "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." <u>Id.</u> This limited exception does not extend to ineffective assistance of appellate counsel. <u>Id.</u>, 556 U.S. at 16, 132 S.Ct. at 1320(stating that the exception "does not concern errors in . . . appeals from initial-review collateral proceedings); <u>also see</u> <u>Davila v. Davis</u>, ___ U.S. ___, 137 S.Ct. 2064, 2065, 198 L.Ed.2d 603 (2017)(decline to expand the *Martinez* exception to the distinct context of ineffective assistance of appellate counsel). Finally, the Fourth Circuit has stated that "[i]f any reasonable possibility exists that the state court may apply an exception to its procedural default rule, the federal court should not apply a state procedural bar to find that exhaustion is futile." <u>Meadows v. Legursky</u>, 904 F.2d 903, 909 (4th Cir. 1990), <u>abrogated on other grounds by</u>, <u>Trest v. Cain</u>, 522 U.S. 87, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997).

The undersigned finds that, to the extent Petitioner claims that the search of his cellphone violated his due process rights under the Fourteenth Amendment, such a claim is procedurally defaulted because it was waived when Petitioner did not assert the same in his first round of State *habeas* proceedings. Petitioner did not dispute Respondent's argument that the above claim was

procedurally defaulted nor did he assert any basis for cause and prejudice to excuse his procedural default. Based upon the foregoing, the undersigned respectfully recommends that Petitioner's above Fourteenth Amendment claim is procedurally defaulted and must be dismissed.

Next, the undersigned considers whether Petitioner's Fourth Amendment claim regarding the alleged improper search of his cellphone is cognizable. In <u>Stone v. Powell</u>, the United States Supreme Court determined that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at this trial." <u>Stone v. Powell</u>, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). The Fourth Circuit has further recognized that "*Stone v. Powell, supra*, marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner had an opportunity to litigate those claims in state court." <u>Grimsley v. Dodson</u>, 696 F.2d 303, 304 (4th Cir. 1982). Once a district court has determined that a state *habeas* petitioner had the opportunity for a full and fair consideration of the Fourth Amendment claim in state court and that opportunity was not impaired, the district court should not inquire any farther into the merits of a petitioner's Fourth Amendment claim. <u>Id.</u> at 304-05(<u>citing</u> <u>Doleman v. Muncy</u>, 579 F.2d 1258 (4th Cir. 1978). The petitioner carries both burdens of pleading and proving the facts and the reasons why did not receive an opportunity for full and fair litigation. <u>Doleman</u>, 579 F.2d at 1258. When determining whether a petitioner had a "full and fair opportunity," the court must "first inquire as to whether or not the petition was afforded an [o]pportunity to raise his Fourth Amendment claims under the then existing state practice." <u>Doleman</u>, 579 F.2d at 1265. Once the "opportunity inquiry" is made by the court, the court "need

not inquire further into the merits of the petitioner's case, when applying _Stone v. Powell_, _supra_, unless the prisoner alleges something to indicate that his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired." Id.

The record demonstrates that Petitioner litigated his above Fourth Amendment claim in the State proceedings, and the Petitioner has not asserted otherwise. Specifically, the record reveals that Petitioner filed motions to suppress concerning evidence seized from the search of the truck including the seizure of his cellphone and related cellular phone records and cellular tower information. (Document Nos. 16-3 and 16-4.) These Motions were thoroughly considered but ultimately denied by the Circuit Court following a hearing and additional briefing on the motions. (Document Nos. 16-8, 16-9, 16-10, 16-11.) Petitioner asserted his Fourth Amendment claims on his direct appeal, but the SCAWV affirmed the decision of the Circuit Court denying Petitioner's Motions to Suppress. White I, 228 W. Va. 544-46, 722 S.E.2d 581-82. Petitioner's Fourth Amendment claims were also fully considered and rejected on the merits by the State _habeas_ courts. (Document No. 9-15.); White II, 2015 WL 7628834, * 2. Despite admitting that he raised this Fourth Amendment claim before the State courts, Petitioner argues that he did not have a full and fair opportunity to litigate this claim because the State courts failed to address the issue light of Riley v. California, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), which was issued in 2014 after his direct appeal (2011). Petitioner's reliance upon Riley, however, does not establish that he did not have a full and fair opportunity to litigate his above claim. See Boggs v. Bair, 892 F.2d 1193, 1199-1200 (4th Cir. 1989)(finding a full and fair opportunity to address a claim existed even where petitioner asserted a change in the law); Daniels v. United States, 2017 WL 1234202 (W.D.N.C. March 31, 2017)(finding that Petitioner did not show that the subsequent decision in

*Safford* deprived him of a full and fair opportunity to litigate his Fourth Amendment claims). The record clearly reveals that Petitioner unsuccessfully argued in his State *habeas* proceedings that the State erred in allowing the State's use of illegally obtained evidence in violation of <u>Riley</u>. (Document No. 9-15.); <u>White II</u>, 2015 WL 7628834, * 2. Although Petitioner disagrees with the State court's decision on the above claim, Petitioner clearly had a full and fair opportunity to litigate the claim. Thus, the undersigned finds that <u>Stone v. Powell</u> applies in the above case because Petitioner had the opportunity for a full and fair consideration of his Fourth Amendment claims in State court and that opportunity was not impaired. Based upon the foregoing, the undersigned respectfully recommends that the District Court deny Petitioner's Fourth Amendment claims based upon <u>Stone v. Powell</u> and grant judgment to Respondent. <u>See</u> <u>Moss v. Ballard</u>, 2011 4017873, * 9 (S.D.W.Va. Sept. 8, 2011)(J. Goodwin)(denying petitioner's Fourth Amendment claim based on *Stone v. Powell* where petitioner "had a full and fair opportunity to challenge the probable cause determination prior to his trial and to litigate his Fourth Amendment claim").

**B.   *Ground Three - Violation of Due Process Rights Based Upon the Circuit Court's Admission of Statements Made by his Co-Defendant Under Rule 801(d)(2)E).***

In his Petition, Petitioner argues a "violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Document No. 2, p. 8.) In support, Petitioner states as follows:

> At trial, the trial court admitted statements made by the co-defendant, Roseann Osbourne, (to police and Angela Barnes) which were in complete contradiction of the United States Supreme Court case law. These statements also did not meet the hearsay exceptions, as they do not establish a proper foundation of a common plan, conspiracy, or joint enterprise. The basis provided by the trial court for allowing the statements failed to declare, with any specificity what the conspiracy or scheme was. Without the faultily admitted hearsay, the Petitioner's conviction would have been impossible.

(<u>Id.</u>)

In his Motion, Respondent argues that the above Ground should be dismissed because it fails to present a cognizable ground for review in federal *habeas corpus*. (Document Nos. 16 and 17.) Respondent argues that "[t]hroughout his State court proceedings, Petitioner consistently presented this issue, not as one involving any federal law, but solely as an issue of the lower court's alleged misapplication or interpretation of a West Virginia State rule." (Document No. 17, p. 19.) Respondent first notes that the above issue is procedurally barred. (Id., fn. 4.) Second, Respondent argues the "Petitioner's claim rest entirely upon the State court's interpretation and application of a State law, thereby not involving any federal issue for this Court to review." (Id.) Respondent argues that Ground Three should be dismissed because "it is purely a question of State law, and, therefore, not cognizable in federal habeas corpus." (Id.)

In Response, Petitioner argues that Ground Three is cognizable on federal *habeas*. (Document No. 24, pp. 4 - 6.) Petitioner contends that "at issue here is the ruling in *Bourjaily v. U.S.*, 483 U.S. 171 (1987) that dictates that proof of a conspiracy by a preponderance of the evidence is necessary before a co-conspiracy statement can be admitted." (Id., p. 5.) Petitioner contends that he "argued in the West Virginia Supreme Court the trial court admitted certain statements (see page ID #156 of Respondent's exhibits) made by the Petitioner's co-defendant, Roseann Osbourne, without the State meeting its obligation of showing proof of a foundation, a common plan, conspiracy or joint enterprise before the statement was introduced." (Id.) Petitioner concludes that "[t]he basis provided by the trial court for admission of the statements of the alleged co-conspirator failed to articulate specifically what the conspiracy or scheme was thought to be." (Id.)

First, the undersigned will consider whether the above claim is procedurally default. To the

extent Petitioner alleges the admission of the co-defendant's statements was in violation of his Due Process Rights under the Fourteenth Amendment, such a claim is procedurally defaulted. The record clearly reveals that Petitioner never presented to the SCAWV his claim that the admission of the co-defendant's statements violated his due process rights under the Fourteenth Amendment. Petitioner does not dispute that the above claim is procedurally defaulted nor does he assert any basis for cause and prejudice to excuse his procedural default. Based upon the foregoing, the undersigned finds that Petitioner's above Fourteenth Amendment claim is procedurally defaulted and must be dismissed.

Second, the undersigned will consider Petitioner's claim that the trial court improperly admitted his co-defendant's statement under Rule 801(d)(2)(E) of the West Virginia Rules of Evidence. Although Petitioner does not appear to dispute that he is alleging a violation of State law, Petitioner cites <u>Bourjaily</u> in an attempt to construe his claim as a violation of federal law. Petitioner's reliance on <u>Bourjaily</u>, however, is insufficient. In his instant Petition, Petitioner does rely upon any federal law or cite <u>Bourjaily</u> in support of his above claim. (Document No. 2, p. 8.) In his direct appeal, Petitioner specifically asserted that the "trial court erred in admitting evidence in violation of Rule 801(d)(2)(e) of the West Virginia Rules of Evidence absent a proper foundation for admission of the statements of alleged co-conspirator." (Document No. 9-9, pp. 18 – 20.) The record clearly reveals that Petitioner was alleging a violation of State law. Although Petitioner referenced <u>Bourjaily</u> in his Petition for Direct Appeal, Petitioner cited <u>Bourjaily</u>[3] for its

---

[3] In finding no abuse of discretion in the trial court's rulings admitting the co-conspirator's statements under Rule 801(d)92)(E) of the West Virginia Rules of Evidence, the SCAWV explained as follows regarding Rule 801(d)(2):

> According to *State v. Fairchild*, 171 W.Va. 137, 144, 298 S.E.2d 110, 117 (1982), "evidence of acts or declarations of co-conspirators or co-actors is admissible only

holding that "Fed.R.Evid. 801(d)(2)(E) requires proof of the conspiracy by a preponderance of the evidence and allows consideration of the offered declaration as part of the proof of the conspiracy." (Id.) There is absolutely no indication in his instant Petition, or in any of his filings in State court, that Petitioner alleged the admission of the co-conspirator's statement violated of federal law. Petitioner focused solely upon the misapplication or interpretation of Rule 801(d)(2)(e) of the West Virginia Rules of Evidence. "[I]n considering federal habeas corpus issues involving state evidentiary rulings, '[federal courts] do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" Barbe v. McBride, 521 F.3d 443, 452 (4th Cir. 2008)(quoting Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000)). The fact that the admitted evidence allegedly was improper under State law, however, does not provide a basis for *habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rulings." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). Accordingly, the undersigned respectfully recommends that the District Court dismiss Ground Three.

### C.  *Ground Six – Violation of Due Process Rights Due to Cumulative Effect of All Errors that Allegedly Occurred During his Underlying Criminal Proceedings.*

---

> if a proper foundation, or prima facie case, is established.... The required foundation consists of: (1) proof of a conspiracy existing between the declarant and the defendant; and (2) proof that the act or declaration was made during and in pursuance of the conspiracy or joint enterprise. (Citation omitted.)" *See Bourjaily v. U.S.,* 483 U.S. 171, 176–81, 107 S.Ct. 2775, 2779–82, 97 L.Ed.2d 144, 153–56 (1987) (holding the Fed.R.Evid. 801(d)(2)(E) requires proof of the conspiracy by a preponderance of the evidence and allows consideration of the offered declaration as part of the proof of the conspiracy); *State v. Nixon,* 178 W.Va. 338, [342], 359 S.E.2d 566, 570 (1987).

*White I*, 228 W.Va. at 543, 722 S.E.2d at 579*(citing State v. Miller,* 195 W.Va. 656, 666, 466 S.E.2d 507, 517 (1995)).

In his Petition, Petitioner argues a "violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Document No. 2, p. 9.) In support, Petitioner states as follows:

> Many pretrial, trial, and post-trial constitutional errors were committed by the trial court in its rulings. It allowed the jury to construct admissions of elements of circumstantial evidence that were obtained by the State unconstitutionally. It allowed illegal cellphone evidence to be presented, an illegally obtained confession to be used, and hearsay statements to be considered by the jury. Although the errors by themselves may not rise to constitutional deficiencies together, when combined they do reach constitutional violations and the trial court should have granted the Petitioner a new trial after he filed a motion for such.

(Id.)

In his Motion, Respondent argues that the above Ground should be dismissed because it fails to present a cognizable ground for review in federal *habeas corpus*. (Document No. 16 and Document No. 17, pp. 20 - 23.) Respondent argues that "[c]laims of cumulative error are not cognizable in federal habeas corpus." (Document No. 17, pp. 21 – 22.) Respondent explains there is no United States Supreme Court "precedent providing for the aggregation of various alleged constitutional errors as a legitimate basis for federal habeas corpus relief." (Id., p. 22.) Respondent further argues that even assuming arguendo that Petitioner has presented a cognizable claim of cumulative error, "[t]he errors alleged by Petitioner that provide the basis of his cumulative error claim rely on claims that are either explicitly not cognizable in federal habeas corpus or, for reasons that have been discussed above, and will be discussed in more detail below, present no legal claim that any constitutional error actually occurred." (Id.) Accordingly, Respondent argues that Ground Six should be dismissed. (Id., p. 23.)

In Response, Petitioner argues that Ground Six is cognizable on federal *habeas*. (Document

No. 24, pp. 6 - 7.) Petitioner contends that "[t]he State court allowed cellphone information that was obtained through an illegal search to stand (a Fifth Amendment violation), an illegally obtained confession to be used, and hearsay statements were admitted to the jury in violation of the Fourteenth Amendment to the United States Constitution." (Id., p. 6.) Petitioner argues that "[t]hese errors contaminated the proceedings and led to manifest injustice." (Id.)

"[T]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a singular reversible error." United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009)(internal quotations and citations omitted). A legitimate cumulative error analysis, however, "evaluates only the effect of matters actually determined to be constitutional error," not the cumulative effect of all alleged errors. See Fisher v. Angelone, 163 F.3d 835 (4th Cir. 1998); United States v. Russell, 34 Fed.Appx. 927 (4th Cir. 2002)(unpublished). Thus, the court must first find there have been actual constitutional errors in order for a cumulative error analysis to apply. See Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1991)(rejecting a request to cumulatively review alleged trial court errors where individual claims of error were determined meritless). In support of his cumulative error claim, Petitioner alleges that the trial court improperly admitted cellphone evidence, his confession, and hearsay statements. For reasons explain infra, the undersigned has determined that Petitioner fails to establish that any of the claims individually constitute constitutional error. The undersigned has otherwise not found any error in the conduct of the trial of constitutional magnitude as Petitioner claims. Accordingly, the undersigned finds that there is no error to cumulate in this case. Therefore, the undersigned respectfully recommends that the District Court dismiss Ground Six.

### D.  Ground Eleven – Violation of Sixth Amendment Right to Effective Assistance of Counsel in State Habeas Proceedings.

38

In his Petition, Petitioner argues that he received ineffective assistance of counsel in his prior *habeas corpus* proceedings and appeal in violation of the Sixth Amendment. (Document No. 2, pp. 12 - 21.) In support, Petitioner states as follows:

> Petitioner received ineffective assistance of counsel in the prior habeas corpus proceedings, White v. Plumley, Jackson County Case No. 11-C-29, and its appeal, No. 14-1272, 2015 WL 7628834 (W.Va. Nov. 23, 2015).
>
> Sean Bayless, the Petitioner's prior counsel in White v. Plumley, Jackson County Case No. 11-C-29, and its Appeal, No. 14-1272, 2015 WL 7628834 (W.Va. Nov. 23, 2015) failed to raise numerous assignments of error relating to the ineffective assistance of counsel the Petitioner received from his trial counsel Matthew Clark and Jeremy Vickers.
>
> ***

(Id.)

In his Motion, Respondent argues that the above Ground should be dismissed because it fails to present a cognizable ground for review in federal *habeas corpus*. (Document Nos. 16 and 17.) Citing Martinez v. Ryan, 556 U.S. 1, 17, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012), Respondent states that "Section 2254(i) explicitly excludes ineffective assistance of counsel at state-level habeas proceedings as a cognizable federal habeas corpus ground." (Document No. 17, p. 23.) Respondent next argues that a state prisoner has no federal right to post-conviction proceedings in State court. (Id., p. 24.) Finally, Respondent contends that "by raising a claim of ineffective assistance of habeas counsel in a federal habeas corpus proceeding, Petitioner is collaterally attacking a proceeding collateral to the one that ultimately resulted in his detention, rather than collaterally attacking the proceeding that resulted in the detention." (Id.) Respondent therefore argues that since Petitioner does not have a constitutional right to state post-conviction proceedings, an infirmity in a state post-conviction does not rise to a constitutional issue cognizable in a federal *habeas* proceeding. (Id.) Respondent concludes that "Petitioner has no

39

federal right to state post-conviction habeas corpus proceedings, and, even though he may have a right to the effective assistance of counsel at such proceedings, they are questions solely involving state law and not federal law." (Id., pp. 24 – 25.) Accordingly, Respondent asserts that Ground Eleven should be dismissed as not cognizable in federal *habeas corpus*. (Id., p. 25.)

In Response, Petitioner argues that Ground Eleven is cognizable on federal *habeas*. (Document No. 24, pp. 7 - 13.) Specifically, Petitioner argues that Martinez v. Ryan "allows for the recognition of ineffective assistance of habeas claims if the claim involves the ineffective assistance of trial counsel." (Id., pp. 7 – 8.) Petitioner then proceeds to set forth arguments in support of his ineffective assistance of *habeas* claims. (Id., pp. 9 – 13.)

Title 28 U.S.C. § 2254(i) provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Additionally, the United States Supreme Court has held that "[t]here is no constitutional right to an attorney in state post-conviction proceedings." Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); also see Pennsylvania v. Finely, 481 U.S. 551, 555, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1985); Johnson v. Avery, 339 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969). As explained above, ineffective assistance of *habeas* counsel regarding a claim of ineffective assistance of *trial* counsel may provide cause for a procedural default in a federal *habeas* proceeding. Martinez v. Ryan, 566 U.S. at 16 - 17, 132 S.Ct. at 1319-20(Where state law requires a petitioner to raise claims of ineffective assistance of trial counsel in an initial-review collateral proceeding instead of a direct appeal, procedural default "will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial" if the default stems from

the ineffective assistance of *habeas* counsel). Ineffective assistance of *habeas* counsel, however, does not by itself present a valid federal claim. Id.; Green v. Ballard, 2015 WL 1612198, at * 5 (S.D.W.Va. April 10, 2015)(J. Chambers)(an allegation of ineffective assistance of *habeas* counsel may only be raised to assert an otherwise procedurally barred claim of ineffective assistance of trial counsel). Furthermore, errors occurring in state post-conviction proceedings typically cannot serve as a basis for federal *habeas corpus* relief. See Wright v. Angelone, 151 F.3d 151, 159 (4th Cir.1998) ("[A] challenge to Virginia's state habeas proceedings, cannot provide a basis for federal habeas relief."); Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir.1988); see also Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S.Ct. 2183, 109 L.Ed.2d 511 (1990)("[A]n infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition."); Vail v. Procunier, 747 F.2d 277, 278 (5th Cir.1984)( "Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief."). Since ineffective assistance of *habeas* counsel is not an independent cognizable claim for federal *habeas* relief, the undersigned respectfully recommends that the District Court dismiss Ground Eleven.

**2.    Trial Court's Failure to Disqualify Two Prospective Jurors (Ground One):**

In his Petition, Petitioner argues that trial court failed to disqualify two prospective jurors, Michelle Lemon and Cassia Scott, resulting in a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. (Document No. 2, p. 7.) In support, Petitioner states as follows:

> Ms. Lemon admitted to the trial judge that she had a personal relationship with Detective Tony Boggs who was a detective in the Petitioner's case. She referred to Detective Boggs as "Tony" and testified that she visited his mother frequently over a ten year period.

Ms. Scott revealed that she was a Jackson County Courthouse employee and had knowledge of the Petitioner's case in her employment capacity. She informed the court that her impression of the case indicated a "sneak attack" which is how the State presented the case. She further informed the court she was concerned about keeping her emotions in check. She also had a negative response to the fact that the case would show an extramarital relationship was engaged in by the Petitioner and answered ambiguously when informed psychological testimony would be part of Petitioner's defense.

The above jurors should never have been on the jury and the trial court abandoned its role as an arbiter of fairness by allowing the two women to be seated, especially so Ms. Scott as her bias toward the Petitioner is clearly evident.

(Id.)

In his Motion, Respondent argues that Petitioner fails to prove that the SCAWV's decision on the above issue was contrary to or an objectively unreasonably application of federal law. (Document No. 16 and Document No. 17, pp. 28 – 32.) Respondent first notes that Petitioner "never presented this claim in State court as a due process violation," but as a denial of his right under State law to reserve the use of his peremptory strikes until a qualified and impartial jury venire was selected. (Id., pp. 30 - 31.) Respondent notes the two jurors Petitioner complains of were ultimately removed from the jury panel by use of Petitioner's peremptory strikes. (Id.) In addressing the above claim, Respondent acknowledges that the SCAWV relied on State precedent that derived its standards from case law from the United States Supreme Court. (Id., p. 30.) Specifically, Respondent states that SCAWV properly determined that "neither juror fell within the category of one who would 'be unable to faithfully and impartially [ ] apply the law.'" (Id.) Respondent argues that "Petitioner's claim that the use of his peremptory strikes to 'correct' the circuit court's refusal to strike the two jurors for cause provides him no solace." (Id.) Citing Rivera v. Illinois, 556 U.S. 148, 158, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009), Respondent explains that

the Due Process Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in criminal trials." (Id.) Thus, Respondent argues that "peremptory challenges are not of federal constitutional dimension" and a State may withhold peremptory challenges without denying a Petitioner the constitutional guarantee of an impartial jury and a fair trial. (Id., p. 31.) Respondent notes to the extent Petitioner argues he was entitled to reserve his peremptory strikes until an impartial and qualified jury venire had been selected, such is a question of State law. (Id., p. 32.) Respondent further notes that even assuming Petitioner had a right to reserve his peremptory challenges, the SCAWV determined that neither juror was unqualified to sit on Petitioner's jury. (Id.) Respondent concludes that the SCAWV identified and applied the correct legal standard with respect to Petitioner's claim. (Id.) Accordingly, Respondent requests that Ground One be dismissed.

In Response, Petitioner argues that the trial court should have disqualified Jurors Lemon and Scott from the jury. (Document No. 24, pp. 13 - 15.) As to Jurors Lemon and Scott, Petitioner repeats the same allegations contain in his Petition concerning the reason he believes the above jurors should have been disqualified by the trial court. (Id., pp. 13 14.) Petitioner argues that a "manifest injustice" resulted from the trial court's failure to strike these two jurors for cause due to Juror Lemon's "relationship" with the lead detective's mother and Juror Scott's employment with the Clerk's Office. (Id., p. 14.) Plaintiff alleges that Juror Lemon's relationship to the lead detective's mother, "would have had to have put a positive light on what 'Tony' testified to" and "how could she have even suggested to the mother and 'Tony' that she though 'Tony' was not telling the truth after the trial." (Id., p. 14.) Plaintiff claims that Juror Scott admitted "[s]he had heard conversations about the case and thought it to be a 'sneak attack,' she couldn't be sure if the

testimony of a psychologist could be true, she read lots of things in the paper about the case," and she was concerned about keeping her emotions in check. (Id.) Petitioner argues that making his attorney use his two of Petitioner's peremptory strikes concerning the above jurors was "fundamentally unfair and the integrity of the trial cannot be said to be upright." (Id.) Petitioner contends that the foregoing would "lead any reasonable jurist to question the trial judge's discretion and his handling of the case." (Id., p. 15.) Petitioner further argues that the SCAWV "unreasonably applied Irvin in the matter." (Id.)

After identifying pertinent State authority that derived from case law from the United States Supreme Court,[4] the SCAWV addressed the issue, in pertinent part, as follows:

> The basis for Mr. White's objection to Ms. Lemon was that she had a relationship with a detective who was the lead investigator in the case. However, the circuit court concluded that Ms. Lemon's only connection was with the detective's mother. In this regard, Ms. Lemon stated the following during voir dire:
>
> | PANEL MEMBER [Ms. Lemon]: | I know Tony Boggs through his mother. |
> | THE COURT: | Okay. |
> | PANEL MEMBER: | But that is it. I do some work for his mom sometimes, clean house or whatever. |
> | THE COURT: | Do you know him beyond his name and who he is? |
> | PANEL MEMBER: | Not really. |
> | THE COURT: | Okay. Okay. |
>
> During individual voir dire, Ms. Lemon was questioned further as follows by the Prosecuting Attorney:
>
> Q. I don't believe you raised your hand for hearing anything or reading anything in the paper did you?
>
> A. Other than kind of—on Tony, just outside of his—for his

---

[4] SCAWV relied upon *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996), which cited *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), and *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). In Early v. Packer, 537 U.S. 3, 7 (2002), the Supreme Court admonished the Ninth Circuit's disapproval of the lower court's failure to cite Supreme Court precedent where the state law relied upon and "impose[d] even greater restrictions" than the relevant federal law.") The Supreme Court explained that the Section 2254(d) deference standard "does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

|      | mom, that's it. |
|------|------|
| Q.   | And so you don't know anything about this case from her or anything like that? |
| A.   | No, No. |
| Q.   | Would your relationship with his mother effect the way you would view his testimony at all? |
| A.   | No. |

In addition, Ms. Lemon was questioned by the defense and gave the following answers:

| Q. | How long have you known Tony's mom? |
|----|------|
| A. | Well, she lives at the end of my road, so I've been there, what, ten years or whatever. And I go there frequently, and haven't seen him over there—but haven't been over there for probably another year now, since I've working another job, so. |

The trial court overruled Mr. White's objection and concluded that "the evidence from the juror doesn't really establish a personal relationship between the juror and Lieutenant Boggs. And even if it did, her answer to the question was that it would not influence her decision making in the case."

Upon our review of Ms. Lemon's voir dire and the circuit court's conclusions regarding the same, we find no error in the circuit court's decision to not disqualify her. Ms. Lemon clearly had no personal relationship with Lieutenant Boggs, and we find nothing in her responses to indicate that she had a "fixed opinion" of this case or that she could not "judge impartially the guilt of the defendant." Syl. pt. 4, in part, *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535.

The basis for Mr. White's objection to Ms. Scott was her equivocal answers with respect to whether she would consider psychological testimony in the same manner she would consider police testimony. During her individual voir dire, Ms. Scott was questioned by the defense, in part, as follows:

| Q. | ... And I'll try to phrase this question correctly: There is going to be some psychological evidence introduced in this case, okay, that Mr. White was suffering from a mental disease or defect at the time of the commission of the alleged crime, okay? Would you be able to consider that psychology testimony in the same manner you would consider police testimony? |
|----|------|
| A. | Are you asking me if I would be able to believe it? |
| Q. | Consider it in the same way, with the same critical eye as you would police testimony. |
| A. | I mean, I would like to say yes, but I—I feel that I could, but—I don't know if there is a right answer, I feel—I mean, I don't know if I could—I think I could. |
| Q. | But are you just not sure? |
| A. | I'm not sure if I would believe it or not, that is what I don't |

45

know if I'm supposed to answer yes or no.

Q.    Okay. That's a different question.

A.    Yea, I mean, I would consider it, of course, but I just don't know whether I would believe it or not.

Q.    Okay. Do you have any reason to cast a more critical eye towards psychological testimony than you would other testimony?

A.    I don't think so. I don't believe so at all. I mean, I do truly believe that there is psychological things that happen, I just don't know that it's—If I'm going to believe it in this case or not. I just don't know.

Q.    And you shouldn't at this point.

A.    Right, and I have no way of answering that.

The trial court overruled Mr. White's objection and explained that "I really thought that Mrs. Scott would be completely open to your defense, I thought. She said—well, as the prosecutor said, she said that she would consider it, of course." We agree with the trial court's conclusion regarding prospective juror Scott. Ms. Scott was clear in stating that she would consider the psychological evidence. She merely qualified this answer by pointing out that she had not yet heard the psychological evidence that would be presented in this case, and, therefore, she could not express an opinion as to how she would perceive that evidence. We find no indication of bias or prejudice.

> We note that
>
> [t]he challenging party bears the burden of persuading the trial court that the juror is partial and subject to being excused for cause. An appellate court only should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law.

Syl. pt. 6, *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535 (1996). Because we find no indication that either prospective juror Lemon or prospective juror Scott would have been "unable faithfully and impartially to apply the law," we conclude that the trial court did not abuse its discretion in refusing to disqualify them. Syl. pt. 6, in part, *id.*

White I, 228 W. Va. at 537-40, 722 S.E.2d at 573-76.

The Sixth Amendment, made applicable to the State through the Fourteenth Amendment, affords an accused the right to a trial by an impartial jury. See Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). The "touchstone of a fair trial is an impartial trier of

fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)(citation omitted). The United States Supreme Court has explained that *voir dire* examination serves to protect the foregoing right "by exposing possible biases, both known and unknown, on the part of potential jurors." <u>Id.</u>; <u>also see</u> <u>United States v. Brown</u>, 799 F.2d 134, 135-36(4th Cir. 1986)("The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel."). "Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." <u>Id.</u>, 646 U.S. at 554, 104 S.Ct. 845. Absent contrary indications, jurors are presumed to be impartial. <u>Poynter v. Ratcliff</u>, 874 F.2d 219, 221 (4th Cir. 1989). The burden of showing a strong possibility of juror bias rests upon the defendant. <u>Wells v. Murray</u>, 831 F.2d 468, 472 (4th Cir. 1987). "The bias of a prospective juror may be actual or implied; that is it may be bias in fact, or bias conclusively presumed as [a] matter of law." <u>Conway v. Polk</u>, 453 F.3d 567, 585 (4th Cir. 2006)(<u>citing</u> <u>United States v. Wood</u>, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed.2d 78 (1936). In <u>Conway</u>, the Supreme Court stated as follows:

> The Court has explained that a juror's bias may be established by showing (1) that the juror "failed to answer honestly a material question on voir dire"; and (2) that a "correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)(the "*McDonough* test"). Additionally, a litigant must show that the fairness of his trial was affected either by the juror's "motives for concealing [the] information" or the "reasons that affect the juror's impartially." *Id.*

453 F.3d at 585; <u>also see</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)(When determining whether a juror should be excluded for cause, the court must consider

47

"whether the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the] instructions and [the juror's] oath."); Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984)(When determining whether a juror is biased, the court should consider "whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant."); Irvin, 366 U.S. at 723, 81 S.Ct. at 1643("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impress or opinion and render a verdict based on the evidence presented in court."). Finally, it is well recognized that the trial court is in the best position to assess the demeanor and weigh the credibility of the juror in question. Patton, 467 U.S. at 1038, 104 S.Ct. at 2885("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying . . . Demeanor, inflection, the flow of questions and answer can make confused and conflicting utterance comprehensible."); Wainwright, 469 U.S. at 426 (since the trial court "sees and hears the juror," the trial court's credibility determination is entitled to "special deference").

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the SCAWV's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. First, the undersigned finds that Petitioner's conclusory claim that that the SCAWV "unreasonably applied Irvin in the matter," is insufficient. Petitioner fails to provide sufficient legal or factual support for his above conclusion. Unsupported, conclusory allegations do not entitle a petitioner to relief. See

Beasley v. Holland, 649 F.Supp. 561, 566(S.D.W.Va. Dec. 2, 1986)(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones v. Gomez, 66 F.3d 199, 204 – 05 (9th Cir. 1995)(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"). Next, the undersigned finds there is no evidence or allegation that anyone with any actual bias was seated on Petitioner's jury. It is undisputed that Petitioner used peremptory challenges to strike both Juror Lemon and Juror Scott. It is well established that a defendant's right to an impartial jury is not violated where a defendant uses a peremptory challenge to remove a potential juror due to the trial court's failure to remove that juror for cause. United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); also see Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed. 80 (1988). Although the Supreme Court in Ross acknowledged that "Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error[,]" the court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." Ross, 487 U.S. at 88, 108 S.Ct. at 2278(Although the trial court's refusal to strike a juror for cause "may have resulted in a jury panel different from that which would have otherwise decided [Ross's] case[,]" the Court determined no constitutional violation because petitioner was unable to demonstrate that the jurors that actually sat on his jury were unqualified.) Specifically, the Supreme Court stated "[w]e have long recognized that peremptory challenges are not of constitutional dimension." Id.(citations omitted). Peremptory challenges "are a means to achieve the end of an impartial jury" and "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not" result in a constitutional violation. Id.(citations omitted).

49

Id., 487 U.S. at 89, 108 S.Ct. at 2279("Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise.") To the extent Petitioner argues he had a right to peremptory strikes under State law, such a claim is not cognizable in federal *habeas* corpus. Estelle, 502 U.S. at 67 - 68, 112 S.Ct. at 475 (stating that "[i]t is not the province of a federal habeas corpus court to reexamine state court determinations on state-law questions."); Engle v. Isaac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)(If state prisoner alleges no deprivation of federal rights, the federal *habeas corpus* statute is simply inapplicable.) Based on the foregoing, the undersigned finds that the SCAWV's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that the District Court deny Petitioner's above claim.

3.    **Brady Violation (Grounds Four and Nine):**

In Grounds Four and Nine of his Petition, Petitioner argues that his Due Process Rights under the Fourteenth Amendment of the United States Constitution were violated when the State withheld allegedly exculpatory or impeachment materials violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). (Document No. 2, pp. 8 and 10.) Specifically, Petitioner claims that State withheld the following: (1) Evidence of prior domestic violence protective order obtained by his co-defendant against the victim in North Carolina; and (2) A video of surveillance footage of the area in which the murder took place. (Id.) Concerning the North Carolina domestic violence records, Petitioner argues that such "would have bolstered the Petitioner's contention that he feared for the safety and well-being of the co-defendant and this

diminished his capacity to be culpable as to the charge of first-degree murder." (Id.) Concerning the surveillance footage, Petitioner argues that such "contradicted the timeline asserted by the State." (Id.) Thus, Petitioner concludes that if he "had the records from North Carolina and/or the video there is no doubt that the jury would have come to a different conclusion in his case." (Id.) Finally, Petitioner asserts that the "above records were willfully and deliberately withheld from the Petitioner because the Petitioner's theory of defense was diminished capacity to commit first-degree murder as he feared for the life of the co-defendant, Roseann Osbourne, due to violence at the hands of the alleged victim, her husband." (Id.)

In his Motion, Respondent first asserts that the SCAWV applied the correct legal standard with respect to Petitioner's claims. (Document No. 16 and Document No. 17, pp. 32 – 36.) Respondent further argues that Petitioner fails to prove that the SCAWV's decision on the above issue was contrary to or an objectively unreasonably application of Supreme Court precedent. (Id., pp. 32 – 36.) Respondent first contends that Brady was inapplicable concerning the domestic violence records from North Carolina because such records were not received by the State until February, 2009, approximately two months after Petitioner's trial. (Id., pp. 33 – 34.) Respondent further asserts that "there is absolutely no basis to believe that the admission of such records would have, in any way, helped Petitioner's defense, notwithstanding Petitioner's complete failure to even demonstrate that the records were suppressed in the first instant." (Id., p. 35.) Respondent explains that "the admission of such records could have hurt Petitioner's defense in that the jury could have reasonably interpreted such records to establish motive; completely contradicting Petitioner's claim that he was suffering from delusions at the time of the murder that prevented him from acting with the requisite intent, premeditation, and deliberation." (Id.)

As to the surveillance video, Respondent argues that such was "not suppressed because the State disclosed its existence to Petitioner, but he chose not to pursue its use at trial." (Id., p. 33.) Respondent further claims that the surveillance video had no material evidentiary value because the timeline of events was immaterial because "Petitioner never disputed the State's evidence that he was present at the scene of the murder, and that he was the one who actually killed the victim." (Id., p. 34.) Respondent concludes that "whether the timeline of events was completely accurate as depicted by the State is of little if any, relevance." (Id., p. 35.) Respondent asserts that "there is absolutely no basis to believe that the admission of such records would have, in any way, helped Petitioner's defense, notwithstanding Petitioner's complete failure to even demonstrate that the records were suppressed in the first instant." (Id.) Therefore, Respondent concludes that Petitioner's claims in Grounds Four and Nine do not demonstrate his entitlement to federal *habeas* relief. (Id., p. 36.)

In Response, Petitioner argues that "[n]ot one, but two *Brady* violations occurred in this trial." (Document No. 24, pp. 15 - 16.) First, Petitioner again argues that "a video could have been used by the defense to rebut the timeline of the incident." (Id., p. 15.) Second, Petitioner disputes that the video was not suppressed by the State. (Id.) Petitioner contends that the finding that "the State had told the Petitioner's counsel about the existence of the video before the trial and counsel did not pursue the matter . . . is in contradiction of the fact that the State disclosed all other material it had, so why not the video." (Id.) Petitioner contends that "[t]he video may have been used to impeach the State's witnesses and timeline evidence and the Petitioner could have testified to the fact that the truck was his and that he had not waited at the park with the intent to act in concert with his co-defendant to slay her husband." (Id., pp. 15 – 16.) Concerning the domestic violence

records, Petitioner argues that such "could have led to a new defense, that of another person, namely Ms. Osbourne." (Id., p. 16.) Therefore, Petitioner concludes that "[t]he suppressed video and the domestic violence court records would have led a jury to have arrived at a different conclusion as it would have put a different light to undermine the confidence in the resultant verdict." (Id.)

Regarding Petitioner's above claim, the SCAWV addressed the issue on direct appeal, in pertinent part, as follows:

> Mr. White complains that, following his trial, and prior to the trial of his co-defendant Ms. Osborne, the State disclosed to him certain records from the State of North Carolina involving domestic violence petitions against the victim, Mr. Mahrous. In addition, Mr. White complains that the State failed to disclose to him a video taken from a surveillance camera of the Ravenswood Specialty Metals Plant, which is in close proximity to the scene of the crime.
> This Court has observed that
>> [t]here are three components of a constitutional due process violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either wilfully or inadvertently; and (3) the evidence must have been material, *i.e.,* it must have prejudiced the defense at trial.
> Syl. pt. 2, *State v. Youngblood,* 221 W.Va. 20, 650 S.E.2d 119 (2007). While Mr. White's brief makes several conclusory statements with respect to this assignment of error, none of the arguments are sufficiently developed to demonstrate how this evidence was material. In this regard, we repeatedly have admonished appellants that " '[a] skeletal " argument," really nothing more than an assertion, does not preserve a claim....' " *State, Dep't of Health & Human Res. v. Robert Morris N.,* 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (citation omitted). *See also Farmer v. Knight,* 207 W.Va. 716, 722, 536 S.E.2d 140, 146 (2000) (per curiam) (" 'It is ... well settled ... that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.' " (quoting *State v. Lilly,* 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995))); *Albright v. White,* 202 W.Va. 292, 298 n. 9, 503 S.E.2d 860, 866 n. 9 (1998) (declining to address issues on appeal that had not been adequately briefed).
> Nevertheless, we note that, as the trial court observed, the State did not possess the North Carolina domestic violence records until February 2009, which

53

was after the conclusion of Mr. White's trial. Therefore, *Brady v. Maryland* did not apply to the domestic violence records. With respect to the surveillance video, the trial court observed that the video was in the possession of the State prior to Mr. White's trial, but concluded that the State had not suppressed the video, because the video had been mentioned in the State's discovery packet. Moreover, the trial court concluded that the video did not have material value in that Mr. White had confessed to killing Mr. Mahrous, and there was no dispute that he was present at Riverfront Park at the time of the killing. Finally, the court observed the exceedingly poor quality of the video, and concluded that it had no evidentiary value insofar as you could not identify any individuals or recognize any vehicles depicted in the video. For these reasons, we find no error in the trial court's denial of Mr. White's "Amended Renewed Motion for New Trial" based on alleged *Brady* violations.

White I, 228 W.Va. at546-47, 722 S.E.2d at 582-83. After citing Brady, Hatfield, and Youngblood

as controlling legal authority, the Circuit Court addressed the issue, in pertinent part, as follows in

Petitioner's *habeas* proceedings:

> At the evidentiary hearing, Mr. Clark testified that he was not certain whether he was aware of the domestic violence protection orders against Mr. Mahrous.
>> **CLARK**: [Petitioner Exhibit number 3] appears to be equivalent to our domestic violence protection order proceedings in North Carolina, involving—well, one of them is someone named Cindy Clayton who—honestly, that name does not ring a bell—against Mohammed Mahrous for alleged civil domestic violence. I honestly, Mr. Bayliss, can't tell I have seen the Cindy Clayton documents. I can't tell you I haven't, but I don't recall that name.
>> **BAYLISS**: I understand. Do you recall, otherwise, having possession of those documents from North Carolina.
>> **CLARK**: I believe I had the ones related to Roseann [Osborne].
>> **BAYLISS**: Okay.
>> **CLARK**: I cannot state with any degree of certainty that I had the Cindy Clayton documents. I may have, but I just honestly don't remember.
>> **BAYLISS**: And with those documents, related to North Carolina domestic violence orders, *et cetera,* did you have those prior to the commencement of the trial?
>> **CLARK**: I believe so, yes,
> *Evidentiary Hearing Transcript,* pg. 14–15, lines 22–21. Likewise, the Petitioner testified that he, too, was aware of the North Carolina domestic violence petitions.
>> **CASTO**: You were aware of the North Carolina issue, as far as it— I think it was a domestic violence petition, correct?

**WHITE**: Yes, ma'am.
**CASTO**: Okay. So even though Ms. Baldwin didn't give you that information, you were aware of it.
**WHITE**: Yes, ma'am. And I had notified both of my attorneys of it.

*Evidentiary Hearing Transcript,* pg. 43, lines 3–10.

Although the Petitioner claimed that Ms. Baldwin had the documents "locked up" in a cabinet until after his trial, *Evidentiary Hearing Transcript,* pg. 39, lines 14–22, the facts, as accepted by the State Supreme Court in *State v. White,* 228 W.Va. 530, 547, 722 S.E.2d 566 (2011), indicate that the State did not possess the records until February 2009, when the newly-elected Prosecuting Attorney James P. McHugh obtained the records in advance of the Roseann Osborne's trial.

The West Virginia Supreme Court has already ruled on this exact issue in *State v. White,* finding that *Brady v. Maryland* does not apply because the State was not in possession of the records in question until ***after*** the Petitioner's trial. *State v. White,* 228 W.Va. 530, 722 S.E.2d 566 (2011). Although Mr. Clark and the Petitioner have admitted that they were aware of the documents, there is no evidence to support the Petitioner's contention that the State had knowledge of the documents, much less possession. Ultimately, in regards to the State's actions and knowledge, the facts remain the same as they were on appeal. The Court finds that there is no merit to the Petitioner's fifth claim, as the claim is res adjudicata.

(Document No. 9-15, pp. 25 - 29.) The SCAWV adopted and incorporated the "Circuit Court's "well-reasoned findings and conclusions" as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. White II, 2015 WL 7628834, * 14 – 15.

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence (often referred to as "*Giglio* material"), exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v.

*Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). A prosecutor, however, does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); also see Kyles, supra, 514 U.S. 419, 437, 115 S.Ct. at 1567("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice.) If the prosecution suppresses Brady material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady, supra, 373 U.S. at 87, 83 S.Ct. at 1196-97.

To state a valid Brady claim, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); Monroe v. Angelone, 323 F.3d 286, 299-300 (4th Cir. 2003). Suppressed evidence is "information which had been known to the prosecution but unknown to the defense." Agurs, supra, 427 U.S. at 103, 96 S.Ct. 2392. "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" United States v. Wilson, 624 F.3d 640, 661 (4th Cir. 2010(citing Bagley, 473 U.S. at 676, 105 S.Ct. at 3375)). Concerning materiality, the Supreme Court emphasized three aspects. Kyles, supra, 514 U.S. at 434, 115 S.Ct. at 1565. First, the Supreme Court stressed that "a showing of materially does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's

acquittal." Id., 514 U.S. at 434, 115 S.Ct. at 1566(*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important.") Stated another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. Therefore, a "reasonable probability" is shown when the suppression of evidence "undermines confidence in the outcome of the trial." Id. Second, the Supreme Court emphasizes that when considering materiality, there is not a sufficiency of the evidence test. Id. The Supreme Court explained that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id., 514 U.S. at 434-35, 115 S.Ct. at 1566. Again, a defendant must only show that the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. Finally, the Supreme Court stressed that the question of materiality must be considered "collectively, not item by item." Id. at 436, 115 S.Ct. at 1567(noting that it was debatable whether lower court assessed the "cumulative effect of the evidence" because the court's decision contained repeated references dismissing particular items of evidence as immaterial, thereby suggesting that cumulative materiality was not the touchstone).

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the SCAWV's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. As stated above, the SCAWV determined that Brady did not apply to the North Carolina domestic violence records as such were not possessed by the State until *after* the conclusion of Petitioner's trial. As

explained above, a determination on a factual issue made by the State court shall be presumed correct, and the burden is on the petitioner to rebut this presumption "by clear and convincing evidence." Petitioner, however, offers no evidence to rebut or contradict the foregoing. Additionally, testimony from Petitioner's omnibus hearing reveals that both his trial attorney and Petitioner were aware of the North Carolina domestic violence petitions involving his co-defendant at the time of his underlying trial. Thus, the North Carolina domestic violence petitions were not suppressed evidence as such was not "information which had been known to the prosecution but unknown to the defense." Agurs, supra, 427 U.S. at 103, 96 S.Ct. 2392. As to the video surveillance, the SCAWV determined that such was not suppressed or material under Brady. Considering what arguments or theories supported, or could have supported the SCAWV's decision, the undersigned finds that the Court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." The record reveals that the existence of the surveillance video was revealed in the State's discovery packet. Thus, the surveillance video was known to the defense. Petitioner contends "[t]he video may have been used to impeach the State's witnesses and timeline evidence and the Petitioner could have testified to the fact that the truck was his and that he had not waited at the park with the intent to act in concert with his codefendant to slay her husband." Beyond Petitioner's conclusory statements to the contrary, there is no indication that the surveillance video contained exculpatory or impeaching evidence. Petitioner confessed to the killing the victim and never disputed his presence at Riverfront Park at the time of the killing. Instead, Petitioner proceeded on a diminished capacity defense arguing that he was suffering from delusions at the time of the killing that prevented him from acting with the requisite intent. Further,

the SCAWV concluded that the surveillance video had no evidentiary value "as you could not identify any individuals or recognize any vehicles depicted in the video." Again, Petitioner offers no evidence to rebut or contradict the foregoing finding by the SCAWV. The undersigned finds there is no indication that the surveillance video was material to the verdict such that the alleged suppression of the video prejudiced the defense. Specifically, the foregoing does not establish a reasonable probability that the alleged suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Based on the foregoing, the undersigned finds that the SCAWV's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that the District Court deny Grounds Four and Nine.

**4.** <u>**Insufficiency of Evidence to Support Conviction (Ground Five)**</u>**:**

In Ground Five of his Petition, Petitioner argues that his Due Process Rights under the Fourteenth Amendment of the United States Constitution was violated because there was insufficient evidence to sustain his convictions. (Document No. 2, p. 8.) In support, Petitioner states as follows:

> The evidence was insufficient to convict the Petitioner of first-degree murder and conspiracy as no direct evidence was ever submitted (none existed) at trial showing some plot between the Petitioner and the co-defendant to conspire to kill the alleged victim. The jury, in incorrectly finding the perquisites of premeditation and deliberation to commit first-degree murder and conspiracy, considered inference upon inference rather than an inference based upon the actual scant circumstantial evidence submitted at trial. At most, the jury should have arrived at a verdict of second-degree murder based on the evidence submitted and the trial court should have granted the Petitioner a new trial after he filed a motion for such.

(<u>Id.</u>)

In his Motion, Respondent first asserts that the SCAWV applied the correct legal standard derived from the United States Supreme Court's decision in <u>Jackson v. Virginia</u>, with respect to Petitioner's claim. (Document No. 16 and Document No. 17, pp. 36 – 42.) Respondent argues that "[i]n light of the evidence that was presented, Petitioner cannot demonstrate that the SCAWV's decision was contrary to, or amounted to an unreasonable application of the <u>Jackson</u> standard." (<u>Id.</u>, p. 41.) Additionally, Respondent argues that Petitioner cannot demonstrate that the SCAWV's decision "was an unreasonable determination of the facts in light of the evidence presented during his trial." (<u>Id.</u>) Respondent notes that "Petitioner admitted to law enforcement that his co-defendant had advised him of the location of the meeting with the victim, a witness overheard both Petitioner and his co-defendant openly discuss their desire to kill the victim, Petitioner admitted to killing the victim with a hammer, and the evidence presented indicated that his co-defendant attempted to obstruct his identification as the perpetrator, in addition to the numerous telephone calls between he and his co-defendant both leading up to, and immediately following the murder." (<u>Id.</u>) Respondent states the "only evidence Petitioner offered in support of his defense of diminished capacity was rebutted by the State with its presentation of its own expert who contested the notion that Petitioner suffered from any mental disease or defect at the time of the murder." (<u>Id.</u>) Therefore, Respondent argues that Petitioner's above claim should be dismissed. (<u>Id.</u>, p. 42.)

In Response, Petitioner first argues that "there was no direct or credible circumstantial evidence to convict the Petitioner, and is the result of inference after inference rather than an inference chiseled out by the meager amount of circumstantial evidence presented to the jury." (Document No. 24, pp. 16 - 18.) Petitioner appears to argue that the SCAWV improperly found that even though "a psychiatrist testified there was no sign of mental disease or defect or

disorder[,]that that alone was sufficient to prove the Petitioner possessed the mental capacity to deliberate on and premediate the crime." (<u>Id.</u>, p. 17.) Petitioner argues that even though the SCAWV found the foregoing, "evidence still had to have been presented to show that deliberation, premeditation, and conspiracy that the Petitioner was convicted." (<u>Id.</u>) Petitioner asserts that "[n]owhere in the State's case is there evidence that the Petitioner engaged in the criminal enterprise that is sufficient to establish the corpus delicti and/or to prove the elements of first degree murder." (<u>Id.</u>, p. 17.) Petitioner states that although there was evidence that he made several phone calls to the co-defendant just hours leading up to and immediately following the murder, Petitioner claims "most of those calls in the hour before the incident were dropped ones in which the Petitioner was trying to contact his codefendant while traveling through the mountains." (<u>Id.</u>, pp. 17 – 18.) Next, Petitioner claims that the friend's testimony that she overheard Petitioner and the co-defendant discussing their desire to murder the victim was unreliable. (<u>Id.</u>, p. 18.) In support, Petitioner states "how reliable is it when a 'friend' pulls a 'Linda Tripp' move and testifies against her friend at trial for murder." (<u>Id.</u>) Petitioner asserts "[h]er motivation could not have been pure, so that evidence has to be deemed unreliable." (<u>Id.</u>) Petitioner concludes "[t]his all adds up to nothing of substance to establish the corpus delicti and prove the elements of first degree murder." (<u>Id.</u>) Concerning his confession being considered as evidence, Petitioner argues that such was error because it should have been suppressed as a coerced confession.[6] (<u>Id.</u>, pp. 18 – 19.) Although Petitioner acknowledges he was informed of his *Miranda* rights, Petitioner states that his "confession was gained after a six hour period in which he felt very intimidated and was not free

---

[6] For the reasons explained below, the undersigned finds that Petitioner confession was voluntary and admission.

to leave." (Id.) Petitioner, therefore, concludes that such should not have been considered by the jury and without such, "the State had no case." (Id.)

Regarding Petitioner's above claim, the SCAWV addressed the issue on direct appeal, in pertinent part, as follows:

> **2. Insufficiency of the evidence of first-degree murder.** Mr. White contends that there was insufficient evidence of premeditation and deliberation to support his conviction of first-degree murder. The record in this case demonstrates that the evidence put on by Mr. White to show a lack of premeditation and deliberation was based upon a defense of diminished capacity. We note that, in briefing the issue of insufficiency of the evidence of first-degree murder, Mr. White has not relied on the evidence he put forth to establish his diminished capacity. *541 **577 Instead, his brief summarily states that the evidence was insufficient to establish premeditation and deliberation.[9] For the purpose of addressing this issue, we will assume Mr. White is basing his argument, at least in part, upon his diminished capacity defense.
>
> The evidence pertaining to Mr. White's diminished capacity was controverted. While Mr. White presented expert testimony that he suffered from "Delusional Disorder–Persecutory Type" that prevented him from being able to premeditate and deliberate or form the specific intent to kill Mohammed Mahrous, the State rebutted that testimony with its own expert who opined that "[t]here was no sign of mental disease or defect or disorder. None." Thus, there was sufficient evidence, provided by the State's expert, from which the jury could conclude that Mr. White possessed the mental capacity to premeditate and deliberate the murder of Mr. Mahrous.
>
> In addition, there was sufficient evidence to establish that Mr. White actually premeditated and deliberated Mr. Mahrous's murder. Premeditation and deliberation are typically established by circumstantial evidence:
>
> > As a practical matter, premeditation generally can be proved only by circumstantial evidence. Because the defendant's mental processes are wholly subjective, it is seldom possible to prove them directly. If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.
>
> *State v. LaRock,* 196 W.Va. 294, 305, 470 S.E.2d 613, 624 (1996). Furthermore, we have held that,
>
> > [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates

the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

Syl. pt. 5, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). The record in this case demonstrates that there was sufficient evidence from which the jury could find, beyond a reasonable doubt, that Mr. Mahrous's murder was carried out by Mr. White with premeditation and deliberation. Notably, in his statement to the police, which was published in full to the jury, Mr. White admitted that, on the night he killed Mr. Mahrous, he followed Ms. Osborne and Mr. Mahrous to Riverfront Park, and that he approached Mr. Mahrous while carrying a hammer in a white plastic bag. The jury could infer from this evidence that Mr. White placed the hammer in the plastic bag to keep his fingerprints off of the hammer, which is an action that plainly demonstrates deliberation and premeditation. The jury could further find deliberation and premeditation by Mr. White based upon the reasonable conclusion that the bag also was used to conceal the hammer and thereby allow Mr. White to approach Mr. Mahrous in a non-threatening way to facilitate a surprise attack. The absence of defensive wounds on Mr. Mahrous supports evidence of a surprise attack. In addition, Mr. White admitted in his statement that he struck Mr. Mahrous with the hammer, and that, after striking Mr. Mahrous, he threw the hammer, got into his vehicle, and fled the scene. Based upon this \*542 \*\*578 evidence, we find no error in the circuit court's conclusion that the evidence was sufficient to support the jury's finding of premeditation and deliberation.

**3. Insufficiency of evidence of conspiracy to commit a felony.** Mr. White argues further that there was insufficient evidence upon which the jury could find him guilty of conspiracy because there was no evidence demonstrating a common plan. We disagree.

" 'In order for the State to prove a conspiracy under W. Va. Code, 61–10–31(1), it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy.' Syl. Pt. 4, *State v. Less,* 170 W.Va. 259, 294 S.E.2d 62 (1981)." Syl. Pt. 3, *State v. Burd,* 187 W.Va. 415, 419 S.E.2d 676 (1991).

Syl. pt. 5, *State v. Minigh,* 224 W.Va. 112, 680 S.E.2d 127 (2009). Furthermore, this Court has explained that

[t]he agreement to commit an offense is the essential element of the crime of conspiracy—it is the conduct prohibited by the statute. The agreement may be inferred from the words and actions of the conspirators, or other circumstantial evidence, and the State is not required to show the formalities of an agreement.

*State v. Less,* 170 W.Va. 259, 265, 294 S.E.2d 62, 67 (1981).

As the trial court observed, there was sufficient circumstantial evidence in this case from which the jury could infer that an agreement to kill Mr. Mahrous

63

existed between Mr. White and Ms. Osborne. Specifically, a friend of Ms. Osborne testified that Ms. Osborne and Mr. White had, in her presence, frequently discussed killing Mr. Mahrous. More persuasive, however, was evidence of numerous telephone calls between Mr. White and Ms. Osborne on the day of Mr. Mahrous's murder, including several that occurred in the hour leading up to and immediately following the murder. Additionally, in Mr. White's confession to police officers, he admitted that Ms. Osborne told him she and her husband were going to Riverfront Park. Finally, Ms. Osborne's attempts to conceal the identity of the killer following the murder, in her call to the 911 emergency center, in a conversation she had with her friend Angelina Barney during which she denied that Mr. White had committed the murder, and in statements she made to police officers, further established the existence of a conspiracy. This evidence provided a sufficient basis for the jury to have concluded, beyond a reasonable doubt, that Mr. White had conspired with Ms. Osborne to murder Mr. Mahrous.

Because there was sufficient evidence presented at trial to establish, beyond a reasonable doubt, that Mr. White possessed the capacity to premeditate and deliberate Mr. Mahrous's murder, that he did in fact commit the murder with premeditation and deliberation, and that he conspired with Ms. Osborne to commit the murder, we conclude that the trial court did not err in denying Mr. White's pre-verdict and post-verdict motions for acquittal.

White I, 228 W.Va. at 540-42, 722 S.E.2d at 576-78. Regarding Petitioner's above *habeas* claim, the Circuit Court addressed the issue, in pertinent part, as follows:

After careful consideration, the State Supreme Court held in the direct appeal of the criminal matter that there was, in fact, sufficient evidence to support findings of guilt on both counts. *State v. White,* 228 W.Va. at 539–42. The Court adopts the Court's legal and factual findings of sufficiency, and further finds that, when viewed in the light most favorable to the State, there is sufficient evidence to support the conviction of the Petitioner.

(Document No. 9-15, pp. 33 – 34.) The SCAWV adopted and incorporated the "Circuit Court's "well-reasoned findings and conclusions" as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. White II, 2015 WL 7628834, * at 17.

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct.

2781, 61 L.Ed.2d 560 (1979). The United States Supreme Court held that "evidence is sufficient to support a conviction whenever, 'after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Parker v. Matthews, 567 U.S. 37, 44, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012)(quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781). When determining in a Section 2254 proceeding whether the above due process right has been violated, a court should "inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." Williams v. Ozmint, 494 F.3d 478, 489 (4th Cir. 2007)(internal citations and quotations omitted)("To determine whether this due process right has been violated, the appropriate inquiry *before the passage of AEDPA* was a straightforward question of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.")(emphasis added). Under this "deferential federal standard," a federal *habeas* court should not "unduly impinge . . . on the jury's role as factfinder." Coleman v. Johnson, 556 U.S. 650, 654, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). The Supreme Court explained that "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts." Id.(quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781)(stating that the "deferential standard" does not permit "fine-grained factual parsing.")

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the SCAWV's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. In deciding the

above issue, the SCAWV applied a standard of review consistent with the federal standard in Jackson, and it was not unreasonable for the SCAWV to find that the testimonial and circumstantial evidence against Petitioner was sufficient to support the jury's determination that Petitioner was guilty of first degree murder and conspiracy to commit murder. According to statute, a person is guilty of first degree murder if a person kills another willfully, maliciously, deliberately, and premeditatedly. W. Va. Code § 61-2-1. West Virginia Code § 61-10-31 defines the offense of conspiracy as follows:

> "It shall be unlawful for two or more persons to conspire (1) to commit any offense against the State or (2) to defraud the State, the state or any county board of education, or any county or municipality of the State, if, in either case, one or more of such persons does any act to effect the object of the conspiracy."

A review of the trial transcripts reveal that sufficient evidence existed for the jury to conclude that Petitioner committed first degree murder and conspiracy to commit a felony. (Document Nos. 16-12 – 16-16.) Taken in the light most favorable to the prosecution, the trial transcripts further reveal that any rational trier of fact could have found that Petitioner willfully, maliciously, deliberately, and premeditatedly killed the victim. The undisputed evidence reveals that Petitioner admitted to killing the victim. Petitioner confused to the police that he followed the victim and co-defendant to the park, he confronted the victim while carrying a hammer concealed in a plastic bag, they got into a fight, and Petitioner hit the victim with the hammer. Petitioner's defense focused upon his claim that he lacked the *mens re* at the time to commit murder. Petitioner's expert psychologist (Dr. Saar) testified that even though Petitioner was not suffering from a mental disease or defect, Petitioner was suffering from Delusional Disorder-Persecutory Type at the time of the killing. The State, however, presented the testimony of Dr. Clayman, who stated there was no evidence to support the conclusion that Petitioner was delusional at the time of the murder. When describing

66

his experience, Dr. Clayman testified that had had performed over 3,000 criminal forensic evaluations. Dr. Clayman further explained that in performing those 3,000 evaluations, approximately 40% had been for the prosecution, approximately 40% for the defense, and approximately 20% for the court. The State presented evidence establishing that telephone calls were made between Petitioner and the co-defendant both shortly before and shortly after the time of the killing. Specifically, testimony was presented that the 911 call from the co-defendant was received at 10:22 p.m. on September 17, 2007. The State then presented cellular phone and site location records from Sprint Nextel establishing the cellular tower "hit" with Petitioner's phone and the timing of these calls as follows: 9:20 p.m. (zero seconds); 9:22 p.m. (1 minute, 5 seconds); 9:25 p.m. (2 minutes, 56 seconds); 9:29 p.m. (9 minutes, 41 seconds); 9:59 p.m. (3 minutes, 43 seconds); 10:02 p.m. (1 minutes, 52 seconds); 10:07 p.m. (19 seconds); and 10:23 (2 seconds). Officer Burnem testified that he was dispatched to the scene of the killing at 10:22 p.m. and arrived at 10:24 p.m. Patrolman Fox testified that he arrived at the scene at 10:27 p.m. Both Officer Burnem and Patrolman Fox testified that the co-defendant told them that an unknown man approached asking for a cigarette and a lighter, and then hit the victim over the head. The co-defendant then provided a description of the alleged killer, which did not match the description of the Petitioner. Angela Barney, a friend of the co-defendant, testified that she heard Petitioner and the co-defendant discussing killing the victim. Although Petitioner argues that he believes the jury incorrectly gave weight to the testimony of Dr. Clayman and Angela Barney, it is the duty of the jury to determine the creditability of witnesses and what weight to assign the evidence presented. See Jones v. Seifert, 808 F.Supp.2d 900, 924 (S.D.W.Va. 2011)(dismissing petitioner's sufficiency of evidence claim based on the argument that the victims' testimony was false because the jury

rejected such by finding the petitioner guilty); Lucas v. McBride, 505 F.Supp.2d 329, 358 (N.D.W.Va. 2007)("The issue raised by the petitioner in his petition to support his claim that there is insufficient evidence to support his conviction are all related to the credibility of the witnesses and the weighing of evidence. Those are issues that were resolved by the jury at trial and are not within the province of federal habeas review."). Thus, it is inappropriate to substitute the jury's credibility determine for one conducted by this Court. The undersigned further finds that based on the ample evidence presented at trial, a rational jury could have found sufficient evidence to convict Petitioner of both first degree murder and conspiracy to commit a felony. See Cavazos v. Smith, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011)(applying the standard in *Jackson* to reinstate a state jury verdict despite considerable discrepancy in the narratives presented by the parties and lack of conclusive evidence); Williams v. Ozmint, 494 F.3d at 490 (finding that a state supreme court's affirmation of a jury verdict based on circumstantial evidence was not objectively unreasonable under Jackson). Based upon the foregoing, the undersigned cannot find that the SCAWV's determination that the evidence was sufficient to support Petitioner's convictions was an objectively unreasonable application of the Jackson standard. Accordingly, the undersigned respectfully recommends that the District Court deny Ground Five.

**5.    Ineffective Assistance of Counsel (Grounds Seven and Ten):**

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. Id. Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that

it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. Id. at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), cert. denied, 506 U.S. 1087 (1993).

Where the State court applies the Strickland standard in the adjudication of a petitioner's ineffective assistance of counsel claim, the standard of review in a Section 2254 proceeding differs from the standard used in the direct review of a Strickland challenge. The United States Supreme Court has explained as following:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This differs from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Williams*, supra, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

Harrington, supra, 562 U.S. at 101, 131 S.Ct. at 785. The Supreme Court acknowledged that "[s]urmounting *Strickland's* high bar is never an easy task," and "[e]stablishing that a state court's

application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." Id., 562 U.S. at 105, 131 S.Ct. 788("The standards created by *Strickland* and § 2254(d) are both 'highly deferential," and when the two apply in tandem, review is 'doubly' so."); also see Woods, supra, 575 U.S. at 315, 135 S.Ct. at 1376(For claims of ineffective assistance of counsel, "AEDPA review must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt.")(internal quotations omitted). The Supreme Court warned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." Harrington, supra, 562 U.S. at 105, 131 S.Ct. 788. Under Section 2254(d), "a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurist could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme Court]." Id., 562 U.S. at 101, 131 S.Ct. at 785. To obtain *habeas* relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id., 562 U.S. at 103, 131 S.Ct. at 787. Applying these standards, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel as set forth above.

In his Petition, Petitioner asserts that he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution. (Document No. 2, pp. 9 – 11.) In support, Petitioner states as follows:

> At trial, the Petitioner's trial attorneys failed to adduce evidence (that was known, or should have been known to them) that would have shown the alleged victim to

be a man of violence and, in fact, of an evil disposition. The Petitioner's attorneys also did not adequately investigate the case as they did not obtain certain court records from North Carolina that showed the alleged victim in the case to have been the subject of domestic violence petitions in that state, they did not call Victim's Advocate Melissa Wilkinson to testify regarding a domestic violence protective order against the alleged victim; did not call witnesses to testify about charges and domestic violence order against the alleged victim in North Carolina and further they did not reveal in any manner that the alleged victim had a shoplifting charge, a drug charge, and immigration issues. They did not hire any investigator as was promised to the defendant.

The Petitioner's theory of defense was diminished capacity to commit first-degree murder as he feared for the life of the co-defendant, Roseann Osbourne due to violence at the hands of the alleged victim, her husband. Had the Petitioner's attorney did their job by adequate investigation and revealed the alleged victim's true nature to the jury a second-degree murder conviction, at worst, would have been arrived at.

***

The Petitioner contends that his trial counsel failed to obtain, investigate, review, and challenge the composition of the grand jury or its procedures. Had this been done the result of the trial would have been different.

(<u>Id.</u>)

In his Motion, Respondent argues that "Petitioner has failed to meet his burden of establishing that the circuit court's decision – which was subsequently adopted and incorporated into [SCAWV's] rationale for affirming the denial of his petition for post-conviction habeas corpus in 11-C-29 – was contrary to, or amounted to an unreasonable application of clearly established federal law. (Document No. 16 and Document No. 17, pp. 42 – 50.) Additional, Respondent states that Petitioner cannot demonstrate that the State court's decision was an unreasonable determination of the facts in light of the evidence presented. (<u>Id.</u>) Respondent explains that the State court "identified the correct legal standard in addressing Petitioner's claims with respect to his trial counsel's alleged ineffectiveness." (<u>Id.</u>, p. 48.) Thus, Respondent asserts that Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking

in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." (Id.) Respondent, however, argues that "Petitioner has offered no support for any of his claims alleging he suffered from ineffective assistance of trial counsel." (Id.) Specifically, Respondent asserts that "[e]ach of his claims lack any legal support to demonstrate that his trial counsel was anything other than entirely reasonable in their preparation and investigation of his case, and their representation of Petitioner at trial." (Id.) To the extent Petitioner argues that his trial counsel failed to conduct an adequate investigation concerning certain pieces of evidence, Respondent argues that such is belied by the record. (Id.) Respondent notes that Petitioner relied on a diminished capacity defense, which trial counsel determined to be a better defense strategy than alleging that the victim "deserved" to be bludgeoned to death with a hammer. (Id.) Respondent notes that trial counsel was entirely reasonable to believe that the jury might infer from the presentation of the domestic violence records or the victim's criminal history that Petitioner was not acting with a diminished capacity, but was acting with motive. (Id., pp. 48 – 49.) As to Petitioner's claim that trial counsel was ineffective in failing to challenge the composition of the grand jury, Respondent argues as follows: (1) "Petitioner has provided no argument or identified any constitutional principle aside from his blanket assertion that such failure violated his rights under the Sixth Amendment of the United States Constitution;" and (2) There is no federal constitutional right to a grand jury in state criminal prosecutions and "if there is no federally guaranteed federal right …, it cannot be said that Petitioner is entitled to federal habeas relief on the basis of his trial counsel failing to challenge a proceeding for which the State is not required to provide under federal law." (Id., p. 49.) Accordingly, Respondent concludes that

72

Petitioner fails to establish that he is entitled to federal *habeas* relief on the above grounds. (Id., pp. 49 – 50.)

In Response, Petitioner first argues that "[t]he introduction of domestic violence records from North Carolina would have shown the alleged victim's propensity to violence, as well as his abusive nature towards Ms. Osbourne." (Document No. 24, p. 19.) Second, Petitioner contends that "Ms. Wilkinson's added testimony would have bolstered the theory of the alleged victim's violence." (Id.) Third, Petitioner claims his "attorney did a woeful job investigating the case or he would have discovered the North Carolina domestic violence petition records and/or hiring an investigator would have aided in this area." (Id.) Fourth, Petitioner alleged that "Mr. Clark did what all attorneys do when under attack at an omnibus hearing dealing with their own ineffectiveness, he hemmed and hawed and produced a litany of 'don't recalls' and 'don't knows' and basically excusing himself from all his errors and ineffectiveness. (Id., p. 20.) Petitioner concludes that his "attorneys did not fully investigate the case or they would have known about the video and the domestic violence records that could have changed the entire tenure of the case and created a defense for the Petitioner." (Id.) Petitioner states that "[p]rejudice attaches to each of the ineffective assistance of counsel claims and the Petitioner should be granted a new trial on each." (Id.)

After identifying the Strickland standard and the equivalent West Virginia authority as the applicable precedent, the Circuit Court made the following findings of facts and conclusions of law concerning the above issue:

> At the evidentiary hearing on the *Petition,* the Petitioner claimed that Mr. Vickers had promised the Petitioner that he would hire a private investigator and medical examiner to investigate the case, although Mr. Clark was clear that an investigator was not warranted given the facts of the case.

73

> **BAYLISS:** As far as wanting a private medical examiner, did you speak about that with Mr., Clark as well as Mr. Vickers?
>
> **WHITE:** Well, I just spoke about it with Mr. Vickers, because Mr. Vickers brought it to my attention. And I assumed that being as Mr. Vickers and Mr. Clark was working together, that whatever was said to Mr. Vickers would [be] relayed to Mr. Clark.
>
> **BAYLISS:** And did you talk to Mr. Clark directly about hiring a private investigator?
>
> **WHITE:** Yes.

*Evidentiary Hearing Transcript,* pg. 43, lines 14–24.

> **BAYLISS:** And again, in this matter, you determined that you didn't believe an investigator was necessary.
>
> **CLARK**: I did not believe an investigator is necessary; I think that is a fair statement.
>
> **BAYLISS**: And for clarification sake, can you explain why you didn't think one was necessary in the fact scenario we have before us?
>
> **CLARK**: The—number one, there was a confession. The facts were pretty well established. The Sheriff's Department did a good job with the investigation. It was very thorough. There weren't, largely, facts in dispute. I talked to some witnesses; some would not talk to me. I remember it became an issue during the trial, subject to the Court ruling.
>
> I just didn't think there were really any facts that weren't already out there that I didn't find out myself. I just don't—I probable [*sic*] didn't have an investigator at the time that I felt was reliable, either.

*Evidentiary Hearing Transcript,* pg. 9, lines 3–20.

Despite not hiring a private investigate, trial counsel *did* fully investigate. At the evidentiary hearing, Mr. Clark testified that he spoke with professionals in North Carolina, and obtained records from the same, including the North Carolina domestic violence protection orders, and information that Mr. Mahrous had been charged with shoplifting and a drug charge. *Evidentiary Hearing Transcript,* pg. 10, lines 1–9; pg. 15, lines 14–17; and pg. 29, lines 21–23. Mr. Clark further obtained a letter from Melissa Wilkinson, and subpoenaed Ms. Wilkinson as a possible witness for the trial. *Id.,* pg. 10–11, lines 22–12.

Ultimately, the issue was not that trial counsel was unaware of these matters; the issue was that these matters **hurt the defense,** as testified to at the evidentiary hearing by the Petitioner's lead trial counsel, Mr. Clark.

> **CLARK**: I don't know specifically why I didn't call [Ms. Wilkinson]. I don't specifically recall that Based on reviewing her statement, it would appear that my concern would have been that it gave motive to the defendant in calling—from my recollection, Mr. White made various attempts to talk to various officials about Mr. Mahrous. There was something from the IS, he had talk to an

Immigration Service agent, I believe. I believe he had talked to a Sergeant Bare here in Jackson County.

And it appeared that he was. doing everything he could to get Mr. Mahrous removed from the situation, for whatever reason. My concern was presenting that evidence would have gave motive to the defendant, perhaps greater than he already had, and would lend more credence to the State's theory. I'm sure that is why I didn't call any of those witnesses.

**BAYLISS**: Did you discuss that decision with Mr. White?

**CLARK**: Certainly did.

**BAYLISS**: And was [he] approving or disapproving of that strategy?

**CLARK**: I think he eventually agreed with it. I don't think he agreed with it at the outset, but I talked with him extensively, but I thought our best shot was the diminished capacity. We did not have a present threat of danger, an imminent threat of—you know, clients don't always understand what self-defense or defense of others, what the requirements of those are.

And I did not believe that any of this helped him toward that defense, And therefore, I believed the diminished capacity was his best shot for two reasons; One, we may get a lesser degree. This wasn't a case we were going to go in and try and not get a conviction of something. ... The diminished capacity allowed me to get instructions on second degree and involuntary that I may not have gotten.

... Also, the benefit of the diminished capacity was that it allowed me to introduce through my psychologist some of the difficulties Mr. White had throughout his life without him testifying.

And so, it somewhat allowed me to back door in some information that I think had some impact on the jury verdict. I have no way of knowing, but that was my strategy.

*Evidentiary Hearing Transcript,* pg. 12–13, lines 3–24.

**CLARK**: And certainly, he had some things in his past. He was not a lily-white victim. I did not believe putting the victim on trial would be an effective strategy. I just really don't—I didn't think it got him anywhere.

... But, yeah, I just didn't think the—I think the theory was—and I'm splitting hairs, I know, but Sam believed there was, you know, an imminent threat of violence of some sort, that it was delusional and wasn't borne out by—if anything, that may have been adverse to my theory, these documents may have been.

*Evidentiary Hearing Transcript,* pg. 17, line 17–20; and pg. 18, line 2–7.

**CLARK**: Sam's position throughout this—Larry Samuel White— was Mohammed [Mahrous] was a really bad guy, a really dangerous guy, and he deserved it. That is not a legal defense. There was no

75

evidence of imminent danger, of self-defense, or protection of others that I could ascertain.

I'm sure I discussed that with Sam in detail. Whether he got it or not, ever, I can't read his mind. But he knew the strategy going in.

*Evidentiary Hearing Transcript,* pg. 19, lines 10–18.

The affirmative defense was that the Petitioner was delusional. The validity—or purported validity—of the Petitioner's complaints against the victim did not mitigate the murder, but rather highlighted the Petitioner's motives to kill him. Trial counsel wisely believed that it would be a better strategy to convince the jury that the Petitioner was a mentally ill man, than to try to convince the jury that the victim deserved to be brutally bludgeoned to death.

At the evidentiary hearing, the Petitioner testified that he wanted to present the "truth" at trial, and denies that the diminished capacity defense was true. *Evidentiary Hearing Transcript,* pg. 40, lines 7–13. The Petitioner testified that Mr. Clark advised him against it. *Id.,* pg. 40, lines 14–23. Although the Petitioner claims that the diminished capacity defense was "the only avenue left open to me," he does admit that he authorized trial counsel to present the defense at trial. *Id.,* pg. 46, lines 17–23.

By results, the diminished capacity defense was the right strategy for the case. That the Petitioner received mercy from the Jury in this case is evidence that trial counsel's strategy was not only an objectively reasonable strategy, but was a successful strategy. In a diminished capacity murder case, receiving a verdict of "first degree murder with mercy" or "second degree murder" is considered a "win."

**CASTO**: Overall, in assessing this trial, do you believe your strategy of diminished capacity was successful?

**CLARK**: Absolutely.

**CASTO**: How so?

**CLARK**: This was a—when I got this case, the first thing was this is a hard case, probably a no-mercy case. Assumed we would have to try the case. The case was never prepared to settle; it was prepared for trial. I told Mr. White the possible verdicts he would receive. I believe I gave him percentages based on just my guess, and I always qualify it.

And second degree would have been nice. I would have considered that a big win if we got second degree. But, with a mercy finding, considering the proof against us, I felt like it worked out pretty well. I believe, you know, no one can speculate on what juries think, why they make their decision but the diminished capacity defense let us get in some aspects of Mr. White, some difficulties in his early life through childhood, and even with his first wife.

You know, I thought brought some humanism to Mr. White. I have to [think] in my heart of hearts, I believe that played a role in the verdict. But whether it did, who knows, but that is what I believe.

*Evidentiary Hearing Transcript,* pg. 30, line 7. Pg. 31, line 6.

76

> In this case, the defense was able to persuade the jury to give mercy to the Petitioner, despite the Petitioner violently murdering an unarmed, unaware man. Although the Petitioner bemoans that counsel should have put the victim on trial, the fact that the Petitioner will become eligible for parole is objective, concrete proof that the counsel was successful in their representation of him.
>
> By the trial transcript and by Mr. Clark's testimony at the evidentiary hearing, it is clear that trial counsel thoroughly investigated the case, and developed a well-reasoned strategy. Not only did counsel act within the professional guidelines, but they were able to obtain a favorable verdict for their client. There is no evidence that "but for" trial counsel's actions the Petitioner's trial would have been more favorable for the Petitioner; to the contrary, there is objective evidence in the form of the Petitioner's verdict, which suggests that "but for" trial counsel's strategy, the Petitioner would have received a far more detrimental result. The Court finds that there is no merit to the Petitioner's first claim.

(Document No. 9-15, pp. 7 – 17.) Concerning Petitioner's claim that trial counsel erred in failing to object to the composition of the grand jury, the Circuit Court found "no merit" to Petitioner's claim. (Id., pp. 29 – 30.) The Circuit Court first noted that "Petitioner did not put on any evidence at the hearing, in regard to this claim." (Id., p. 30.) The Circuit Court then concluded that the parties failed to cite "a single case in West Virginia in which habeas relief was granted on the grounds of a defense attorney failing to challenge the composition of the grand jury." (Id.) The SCAWV adopted and incorporated the Circuit Court's "well-reasoned findings and conclusions" and affirmed the Circuit Court's decision. White II, 2015 WL 7628834, * at 2, 5 – 10, 15.

The undersigned finds that there is no evidence that the State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. First, Petitioner does not dispute that the State courts correctly referenced the Strickland standard as applicable law to Petitioner's ineffective assistance of counsel claim. Petitioner, however, appears to argue that the State Courts unreasonably applied Strickland to the facts of his case. Petitioner argues that the State *habeas* courts unreasonably concluded that trial counsel adequately investigated the case because an

77

adequate investigation would have revealed the North Carolina domestic violence records. During the omnibus hearing, however, counsel testified he found it unnecessary to hire a private investigator because the facts were largely undisputed and he personally conducted his own investigation by talking to witnesses and obtaining records. (Document No. 16-27,  pp. 9 – 10.) Specifically, counsel testified that he talked with professionals from North Carolina, obtained a copy of the North Carolina domestic violence records, and information that Mr. Mahrous had been charged with shoplifting and a drug charge. (Id., pp. 10 - 11, 16, 30.) Counsel further testified that he obtained a letter from Melissa Wilkinson, and subpoenaed Ms. Wilkinson as a possible witness for the trial. (Id., pp. 11 – 12.) Although Petitioner concludes that counsel failed to conduct an adequate investigation, Petitioner fails to indicate what, if anything, a further or more thorough investigation would have revealed and how such would have changed the outcome. Based upon the foregoing, the undersigned cannot find that the State court's application of Strickland was unreasonable under § 2254(d).

Next, Petitioner argues that the State *habeas* courts unreasonably determined that trial counsel did not act ineffectively by failing to introduce the North Carolina domestic violence records and failing to call Melissa Wilkinson as a witness. Although counsel testified that he was aware of the North Carolina domestic violence records, had subpoenaed Melissa Wilkinson as a possible witness, and had information that the victim had been charged with shoplifting and a drug offense, counsel decided as a matter of trial stagey to not present the foregoing. (Document No. 16-27, pp. 11, 16, 30.) Decisions concerning what defenses and evidence to present are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under Strickland. Trial counsel, however, "has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, supra, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. As stated above, the State habeas courts determined that trial counsel's failure to present the foregoing evidence was a matter of trial strategy and not deficient under an objective standard of reasonableness. Considering what arguments or theories supported, or could have supported the SCAWV's decision, undersigned finds that the State court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Despite Petitioner's "Monday morning quarterbacking" review of counsel's choice of trial strategy," there is no indication that trial counsel acted unreasonably in proceeding with a trial stagey of diminished capacity instead of victim blaming. Although trial counsel acknowledged he was aware of the domestic violence petitions against the victim and his criminal record, trial counsel explained that presenting such would have hurt the defense of diminish capacity as such could have allowed the jury to conclude that Petitioner had motive to murder the victim. (Document No. 16-27, pp. 13 – 14.) Trial counsel testified that proving the victim "was a really bad guy, a really dangerous guy, and he deserved it" was "not a legal defense" and "[t]here was no evidence of imminent danger, of self-defense, or protection of others that I could ascertain." (Id., p. 20.) Trial counsel explained that "the medical examiner's testimony and report indicated it was an attack from behind." (Id., p. 29.) Trial counsel further testified that he believed his diminished capacity strategy allowed him to get jury instruction on second degree murder and involuntary manslaughter, which he may not have received with another strategy. (Id., pp. 13 –

79

14.) Additionally, trial counsel testified that he was able to present "some of the difficulties [Petitioner] had throughout his life" through the testimony of the psychologist, which could have had some impact on the jury's verdict. (Id.) Trial counsel testified that he believed his strategy allowed Petitioner to receive a recommendation of mercy, which he considered to have "worked out pretty well." (Id., p. 31.) Furthermore, there is no indication in the record that the presenting of domestic violence record or criminal history of the victim would have yield a more favorable result. Based upon the foregoing, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts.

Finally, Petitioner argues that trial counsel was ineffective in failing to challenge the composition of the grand jury. The State *habeas* Courts noted that Petitioner failed to present any evidence supporting the above claim and dismissed such as without merit. In his instant Petition, Petitioner does not allege that State *habeas* Court's determination on the above claim was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Thus, the undersigned finds that Petitioner above claim of ineffective assistance of counsel is insufficiently plead. Petitioner merely concludes that trial counsel was ineffective in failing to challenge the composition of the grand jury. Petitioner fails to set forth any analysis or explanation as to why counsel should have taken certain acts or how Petitioner was prejudice by such failure. Additionally, the Court notes that it is the duty of the grand jury to determine whether an individual should be *charged* with an offense. It is not, however, the duty of the grand jury to determine whether an individual is guilty or innocent. Even assuming there was error in the composition of the grand jury, Petitioner is not entitled to relief because "the petit

80

jury's verdict renders harmless any conceivable error in the charging decision that might have flowed from the violation." United States v. Mechanik, 475 U.S. 66, 73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Furthermore, there is no federal constitutional right to grand jury review before trial in a state proceeding. Hurtado v. California, 110 U.S. 516, 534-35, 4 S.Ct. 111, 28 L.Ed. 232 (1884); also see Coles v. Smith, 577 Fed.Appx. 502, 506 (6th Cir. 2014)(citing Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)("The Supreme Court has not applied to the States the Fifth Amendment's requirement that all prosecutions begin with a grand jury indictment."); Green v. Hoke, 2009 WL 774491, * 5 (S.D.W.Va. March 20, 2009)(J. Goodwin)(Dismissing petitioner's claims regarding grand jury proceedings "[b]ecause there is no federal constitutional right to a grand jury review before trial in a state proceeding, and any defect in a grand jury proceeding is rendered harmless by jury conviction.")(internal citations omitted).

Based upon the foregoing, the undersigned respectfully recommends that the District Court dismiss Grounds Seven and Ten of Petitioner's Petition.

**6.    Challenge to Confession (Ground Eight):**

In his Petition, Petitioner argues that his Due Process Rights under the Fourteenth Amendment of the United States Constitution were violated when trial court improperly admitted his confession into evidence. (Document No. 2, p. 10.) In support, Petitioner states as follows:

> The Petitioner gave a statement that was the result of a six hour interrogation in which the Petitioner felt very intimidated and was not free to leave. The Petitioner ultimately gave a statement implicating himself. This confession should not have been admitted by the trial court and it erred in not granting the Petitioner's motion to suppress the statement. Without the statement, the Petitioner is at worst, convicted of second degree murder, not first degree.

(Id.)

In his Motion, Respondent argues that "Petitioner has failed to meet his burden of proof in

establishing his entitlement for relief" as to the above Ground. (Document No. 16 and Document No. 17, pp. 50 – 53.) First, Respondent asserts that the Circuit Court applied the correct legal standards implicated by Petitioner's allegation of a coerced confession. (Id., p. 52.) Respondent notes that the Circuit Court "acknowledged that Petitioner had been advised of his Fifth Amendment rights as stated in *Miranda*, and noted that the Petitioner waived those rights freely and voluntarily, as evidenced by his execution of a written *Miranda Rights Waiver Form*." (Id.) Next, Respondent states that the transcripts and recording of the interrogation "yielded no support for Petitioner's claims that his confession was coerced." (Id., p. 53.) Respondent contends that the Circuit Court made the following findings: (1) Officers showed Petitioner respect and sympathy throughout the course of the interrogation; (2) Officers never threatened Petitioner physically or verbally; and (3) Although the interview took place late at night and into the early morning hours, the interrogation was conducted at a time when Petitioner was typically awake as Petitioner worked nightshift. (Id.) Thus, Respondent argues "there is no indication that the Circuit Court's decision was contrary to, or amounted to an unreasonable application of clearly establish Federal law," or an unreasonable determination of the facts in light of the evidence presented. (Id., p. 53.)

In Response, Petitioner continues to argue that his confession was coerced. (Document No. 24, pp. 18 - 19.) In support, Petitioner reasserts that his "confession was gained after a six hour period in which he felt very intimidated and was not free to leave." (Id., p. 18.) Petitioner argues that "[a]lthough [he] was informed of his Miranda rights, the statement he gave was under duress and despite their contentions, he was never free to leave." (Id.) Petitioner states that "[h]e was harassed and intimidated into giving the statement after much coercion, again, over a six hour period." (Id.) Petitioner claims he "was overborne by the circumstances of the interrogation"

because "[i]t was late at night, his very freedom was at stake, and he could not make a deliberate choice as to the soundness of giving the statement." (Id., p. 19.)

Regarding Petitioner's above *habeas* claim, the Circuit Court found as follows:

C. *Relevant Facts*— The Petitioner was questioned by then Lieutenant A.J. Boggs and then-Patrolman G.C. Burnem at the Warrick County Sherriff's Department in Warrick County, Indiana on September 19, 2007. According to the transcript of the Petitioner's statement, the questioning began at approximately 9:53 p.m. and ended at 3:20 a.m. The transcript also shows that the Petitioner was informed of his *Miranda* rights, as follows:

> **BOGGS**: But before I ask you any questions, you must understand your rights. You have the right to remain silent. Anything that you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. I'm sorry. If you decide to answer questions at this time without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand all this, Sam?
>
> **WHITE**: Yes, sir.

*Transcript of Petitioner's Statement,* pg. 5. The Petitioner also initialed and signed a *Miranda Rights Waiver Form,* acknowledging that these rights were read to him, that he understood said rights, and that he was waiving the rights.

Then–Lieutenant Boggs and then-Patrolman Burnem testified at the pretrial hearing on September 5, 2008 and at the trial regarding the circumstances of taking the Petitioner's statement. According to the testimony, the Petitioner voluntarily agreed to be transported from his place of employment to the Warrick County *Sheriff's* Department, which was about a fifteen minute drive. *Trial Transcript: Volume III,* pgs. 81–82. When he was transported, and during the first part of the statement, the Petitioner was not under arrest, was free to leave, and was advised of the same. *Pretrial Transcript,* pg. 79. Approximately three to three-and-a-half hours into the interview, the officers informed the Petitioner that he was no longer free to leave, but the Petitioner agreed to continue the interview. *Pretrial Transcript, pg.* 80. The Petitioner was not arrested or placed in handcuffs until the conclusion of the interview. *Pretrial Transcript,* pg. 80.

During the course of the interview, the Petitioner, at all times, appeared coherent, and he appeared to be of at least average intelligence. *Pretrial Transcript,* pg. 82. The Petitioner did not appear impaired in anyway, and did not appear to be under the influence of drugs and/or alcohol. *Pretrial Transcript,* pg. 82, lines 9–14;

*Trial Transcript, Volume III,* pg. 85.

The officers did not threaten or intimidate the Petitioner in any way during the course of the interrogation. The entire interrogation was recorded by audio/video, **and** by digital audio. At no time in either recording can there be seen any act of coercive or threatening behavior by either officer. In fact, at one point during the statement, the Petitioner's voice drops and he begins talking slowly; instead of becoming aggressive and getting in his face, then Lieutenant Boggs mimics the Petitioner's behavior, and begins speaking softly and slowly, almost to the point where it becomes difficult to hear him. Moreover, the officers allowed for about a five minute restroom break to be taken. *Pretrial Transcript,* pg. 96–97; *Trial Transcript: Volume III,* pg. 88.

Although the interview occurred at night, the Petitioner was working night shifts at the time, such that the time of day of the interview would be congruent with the hours in which the Petitioner would normally be awake and active. Also, the officers did not fully begin the "interrogation" aspect of the interview until approximately sixty or seventy minutes into the interview. *Pretrial Transcript* pg. 81–82.

D. *Analysis & Conclusions*—The recordings and the transcript of the interview demonstrate that the Petitioner was not only advised of his *Miranda* rights, but was also treated with respect and sympathy throughout. He was not deprived of necessities, he was not kept up at a time of night for-which he was not accustomed to being awake during, he was not mistreated—either verbally or physically—and at all times he was aware of his rights. Ultimately, this case echoes the case of *State v. Bradshaw,* and like the confession in *Bradshaw,* it was proper for the trial court to admit the Petitioner's confession in this case. The Court finds that there is no merit to the Petitioner's fourth claim.

(Document No. 9-15, pp. 21 - 25.) The SCAWV adopted and incorporated the "Circuit Court's "well-reasoned findings and conclusions" as to all the assignments of error raised in this appeal" and affirmed the decision of the Circuit Court. White II, 2015 WL 7628834, * at 2, 11 – 13.

The Fifth Amendment protects individuals from compelled self-incrimination. U.S. Const. Amend V. Thus, if a person in custody is to be subjected to interrogation, he must first be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A valid waiver of *Miranda* rights involves two

components: (1) the waiver must have been voluntary, and not the result of any coercion by law enforcement officers; and (2) the waiver must have been knowingly and intelligently made. See Colorado v. Spring, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987). When making this determination, the Court should consider the "totality of the circumstances surrounding the interrogation." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)(citation omitted).

A statement "is involuntary under the Fifth Amendment only if it is 'involuntary within the meaning of the Due Process Clause." United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997), cert. denied, 522 U.S. 874, 118 S.Ct. 192, 139 L.Ed. 130 (1997)(A police officer is prohibited from coercing a defendant into making an involuntary or coerced statement.). A statement is involuntary, if a defendant's will to resist is overpowered as the result of police conduct such that the defendant could not refuse making the incriminating statement. See Braxton, 112 F.3d at 783; United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987), cert. denied, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988). The Court must look to the "totality of the circumstances," including the "characteristic of the defendant, the setting of the interview, and the details of the interrogation" in determining whether the individual was unduly influenced and whether the confession was voluntary. Pelton, 835 F.2d at 1071. The test for determining whether a statement is involuntary under the Due Process Clause "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired." Id. Relevant factors for the Court's consideration include the defendant's age, education, level of intelligence, the duration of questioning, the use of physical coercion or deprivation, the defendant's experience with the criminal justice system, and whether the defendant has been advised of his Miranda rights. See

United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995). Finally, the United States Supreme Court has recognized that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986.)

A knowing and intelligent waiver of *Miranda* rights occurs when the waiver is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421, 106 S.Ct. at 1141. The Constitution, however, "does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado, 479 U.S. at 574, 107 S.Ct. at 857(citation omitted). The Court should consider the totality of the circumstances when determining whether an individual's waiver was knowing and intelligent. In United States v. Robinson, 404 F.3d 850 (4th Cir. 2005), the Fourth Court focused on whether the suspect expressed to the officers "an inability to understand the rights as they were recited" and whether the record contained any indication that the suspect did not understand his rights. United States v. Robinson, 404 F.3d 850, 860-61 (4th Cir. 2005), cert. denied, 546 U.S. 916, 126 S.Ct. 288, 163 L.Ed.2d 253 (2005). Specifically, the Fourth Circuit explained as follows:

> In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited. In United States v. Rosario-Diaz, 202 F.3d 54 (1st Cir. 2000), the First Circuit upheld the denial of a suppression motion involving a woman with an IQ in the 70s and no prior experience with the criminal justice system because the officers testified that the woman understood the questions and rights. Id. at 69. See also United States v. Male Juvenile, 121 F.3d 34, 40 (2nd Cir. 1997)(finding waiver was knowing for juvenile with attentional and learning disabilities because juvenile indicated that he understood the rights as they were being read to him).

Id. at 861.

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the State *habeas* court's determination was contrary to a reasonable application of federal law, or based on an unreasonable determination of facts. Petitioner does not dispute that the State *habeas* court correctly referenced applicable law to Petitioner's coerced confession claim. Petitioner appears to argue that the State *habeas* court's determination was contrary to a reasonable application of federal law, or based on an unreasonable determination of facts. Petitioner concludes his confession was coerced because "[h]e was harassed and intimidated into giving the statement after much coercion, again, over a six hour period," "the statement he gave was under duress," "he felt very intimidated and was not free to leave," and he "was overborne by the circumstances of the interrogation." Petitioner offers no specific factual allegations or evidence supporting how he was allegedly harassed, intimidated, or placed under duress. It is undisputed that Petitioner was advised of his Miranda rights and he signed a *Miranda Rights Waiver Form* acknowledging that he understood his rights and was waiving such. The State *habeas* court reviewed Lieutenant Boggs and Patrolman Burnem's testimony, and determined that "during the first part of the statement, the Petitioner was not under arrest, was free to leave, and was advised of the same." The State *habeas* court determined it was not until 3 ½ hours into the interview that the officers informed Petitioner he was no longer free to leave, and Petitioner agreed to continue the interview. The State *habeas* court noted that the "entire interrogation was recorded by audio/video, and digital audio," and "at no time in either recording can there be seen any act of coercive or threatening behavior by either officer." The State *habeas* court further found that Petitioner was allowed a bathroom break during the interview. Finally, the State *habeas* court determined that even though the interview occurred

87

at night, the interview occurred within hours Petitioner would normally be "awake and active" because Petitioner was working night shifts. As stated above, "a determination on a factual issue made by the State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Besides conclusory assertions, Petitioner presented no evidence to rebut the State court's findings. The record is void of any evidence suggesting that Petitioner's will was overborne or that his capacity for self-determination was critically impaired. The State *habeas* court concluded that the trial court properly admitted Petitioner's confession into evidence because there was a voluntary, valid waiver of *Miranda* rights. Considering what arguments or theories supported, or could have supported the State *habeas* Court's decision, undersigned finds that the State court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." In arguing that his confession was involuntary, Petitioner places much emphasis upon the fact that his interrogation lasted for six hours. Standing alone, the mere fact that an interrogation lasted for six hours does not render a confession involuntary. See Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968)(finding a confession to be involuntary where defendant was interrogated for over 18 hours without food, sleep, or necessary medication); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967)(confession coerced where police held a gun to defendant's head and interrogated him while he was in the hospital and under the influence of morphine); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958)(finding a confession coerced where defendant was held for three days with limited food and threatened with attack by a lunch mob); Hayes v. Plumley, 740 Fed.Appx. 772, 776-78 (4th Cir. July 3, 2018)(noting that a two and half hour interrogation is

"relatively short in duration"); <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993)(finding a six or seven hour interview did not render a confession involuntary); <u>Gould v. Chavis</u>, 2014 WL 1117925, * 6 (E.D.N.C. March 20, 2014)("Although petitioner states that his confession was coerced because he was in a locked room in the police station, he spent fifteen (15) minutes attempting to get an officer's attention so that he could use the bathroom, he had been awake for thirty-one (31) hours, and he had not been given his prescribed pain medications for his injuries, applying the totality of the circumstances analysis, the court finds that these facts are insufficient to establish coercion."); <u>Wilson v. Walker</u>, 2001 WL 1388299, * 4 (E.D.N.Y. Nov. 2, 2001)(finding the post-*Miranda* statement admissible where petitioner was questioned for seven continuous hours but petitioner was never told that he could not leave, he was allowed to go to the bathroom unattended, he was given food and drink, and the questioning was not overly aggressive and did not employ trickery or deceit.) Therefore, the undersigned finds that the State *habeas* Court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that the District Court deny Ground Eight of Petitioner's Petition.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's "Motion to Dismiss and for Summary Judgment" (Document No. 16), and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is

hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Joseph R. Goodwin. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to send a copy of the same Petitioner, who is acting *pro se*, and to counsel of record.

Dated: February 7, 2023.



Omar J. Aboulhosn
United States Magistrate Judge